Filed 9/26/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| OTAY LAND COMPANY, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> U.E. LIMITED, L.P., et al., <br><br> Defendants and Appellants. | D068347, D069029 <br><br> (Super. Ct. Nos. GIC869480; <br> 37-2009-101976-CU-OR-CTL; <br> 37-2012-104941-CU-BT-CTL; <br> 37-2013-048508-CU-BT-CTL) |


APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Richard E. L. Strauss, Judge. Affirmed in part; reversed in part; and remanded with directions.


Shoecraft Burton, Robert D. Shoecraft and Devin T. Shoecraft for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Sally Magnani, Assistant Attorney General, Susan Fiering and Andrew Wiener, Deputy Attorneys General, for amicus curiae on behalf of Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, R. Gaylord Smith, Thomas A. Teschner and Brittany H. Bartold for Defendants and Appellants U.E., Limited, L.P., U.E. Limited, LLC, John T. Knox and Rose Patek.

Gatzke Dillon & Balance, Stephen F. Tee and Stephen A. Sunseri for Defendants and Appellants Baldwin Builders, The Otay Ranch, L.P. and Sky Vista, Inc.

I.

INTRODUCTION

These consolidated appeals involve a property where a shooting range had been operated for decades (the Property), its remediation by Plaintiffs Otay Land Company, LLC (OLC) and Flat Rock Land Company, LLC (FRLC) (collectively, Plaintiffs), and their efforts to recover remediation costs from former owners under the Carpenter-Presley-Tanner Hazardous Substances Account Act (HSAA; Health & Saf. Code, § 25300 et seq.).[1]  Defendants are former owner United Enterprises, Inc. (UEI) and its successors, including United Enterprises, Ltd. (UEL) (together, UE Defendants or UE), and former owner Baldwin Vista Associates, L.P. (now The Otay Ranch, L.P.) and certain of its general partners (together, Baldwin Defendants or Baldwin) (collectively, Defendants).  Plaintiffs also asserted common law claims for continuing nuisance and

---

[1]     Unless otherwise noted, statutory references are to the Health and Safety Code.

continuing trespass, including in subsequent lawsuits that have been consolidated with this action.[2]

The case proceeded to a bench trial. The trial court's Statement of Decision addressed issues regarding whether Plaintiffs had a private right of action, liability, defenses, the allocation of costs, and cost reductions, each in the alternative, and held Plaintiffs should take nothing. The court entered judgment for Defendants. Defendants moved for attorney fees and costs, which the court denied.

Plaintiffs appeal from the judgment. The gravamen of their appeal is that the trial court erred in its interpretation and application of the HSAA. We agree, and as our analysis will reflect, several of these issues involve novel questions of law under the HSAA. We affirm certain rulings, reverse the judgment in all other respects, and remand with directions.

Defendants appeal from the court's denial of their fee and cost motions. In light of our reversal of the judgment, these appeals are moot.

---

[2] The other UE Defendants are U.E. Limited, L.P., and U.E. Limited, LLC. The other Baldwin Defendants are Baldwin Builders, Baldwin Vista, Inc. (now Sky Vista, Inc.), and Baldwin Communities, Inc. (now Sky Communities, Inc.). Individual defendants John T. Knox and Rose Patek are also respondents, but Plaintiffs do not address them specifically. To the extent our conclusions apply generally, they apply to these respondents, but Plaintiffs forfeit any challenge to rulings particular to Knox or Patek. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.) Plaintiffs also had claims for equitable indemnity, unjust enrichment, unfair competition, and declaratory relief, which the court denied as being moot in light of its HSAA determination and on other grounds. Plaintiffs do not address these claims on appeal and forfeit them as well. (*Tiernan*, at p. 216, fn. 4.)

3

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual overview*

Stephen Birch founded the predecessor to UEI, which purchased the Otay Ranch land encompassing the Property. In 1965, UEI opened a commercial shooting range on the Property, and the range remained in operation until 1978. In 1970, white fill material was used to build additional skeet and trap fields. Some, but not all, lead shot was recovered, and the only efforts to address target debris were to chop and cover it. In addition, the range was "disked" at various points (i.e., a tool known as a disk was used to cut through the ground and turn soil over). In 1986, UEI became a limited partnership (UEL), and the Estate of Mary Marshall Rand Birch Patrick (Stephen Birch's daughter) was one of the limited partners.

In 1988, UEL sold part of the Otay Ranch land to Baldwin, and the Estate received a promissory note encompassing the Property. A lessee reopened the range in 1990, and it remained operational until 1997. Again, some, but not all, lead shot was recovered, and no target debris was reclaimed. Baldwin also contracted with companies that used the land for wood chipping operations, the latter of which left a wood pile upon its departure.

The Estate took title to the Property in 1997, after Baldwin defaulted on its payment obligations and provided deeds in lieu of forfeiture. The Estate contacted Baldwin about the wood pile, and Baldwin hired a contractor to clean the wood pile to the surface. In 2003, OLC transferred the Property to FRLC, a wholly owned subsidiary. OLC and FRLC began the remediation process, during which it was determined the soil

4

contained lead and polynuclear aromatic hydrocarbons (PAH's) attributable to the target debris, and that perchlorate on the site was from the white material.

FRLC applied pursuant to Health and Safety Code chapter 6.65 (§ 25260 et seq., herein the Assembly Bill No. 2061 process) for the San Diego County Department of Environmental Health (DEH) to be the administering agency for the remediation.[3] During this process, DEH requested review by the California Department of Toxic Substances Control (DTSC). DTSC has oversight for response actions under the HSAA (§ 25323.3), and is authorized by the HSAA to initiate such actions, order responsible parties to do so, and recover costs incurred by the state, among other things. (See §§ 25355, 25358.3, 25360.) FRLC obtained a certificate of completion pursuant to the Assembly Bill No. 2061 process.

B. *Litigation*

Plaintiffs initially filed suit in 2003 in federal court, asserting claims against Defendants under the Resource Conservation and Recovery Act of 1976 (RCRA, 42 U.S.C. § 6901 et seq.); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, 42 U.S.C. § 9601 et seq.); the HSAA; and on other state law grounds. In 2006, the district court granted summary judgment on the CERCLA and RCRA claims, and declined to exercise jurisdiction over the state law

---

[3] Assembly Bill No. 2061 added Chapter 6.65 to Division 20 of the Health and Safety Code. (See Assem. Bill No. 2061 (1993-1994 Reg. Sess.); Stats. 1993, ch. 1184, § 1, p. 6771.) The parties and trial court use the term "AB 2061," which use has been retained within quoted material herein.

claims. (*Otay Land Co. v. U.E. Ltd. L.P.* (S.D. Cal. 2006) 440 F.Supp.2d 1152, 1157-1158.) In 2009, the Ninth Circuit vacated the judgment on ripeness grounds. (*Otay Land Co. v. United Enterprises Ltd.* (9th Cir. 2009) 338 Fed. Appx. 689, 691.)[4]

In 2006, Plaintiffs sued Defendants in San Diego County Superior Court under the HSAA and for nuisance and trespass. Defendants filed motions for summary judgment and/or adjudication, which the trial court denied. In 2013, the case proceeded to trial. The court severed the nonjury HSAA claim from the jury issues. At the close of the bench trial, the parties submitted closing briefs. The trial court directed the parties to prepare proposed statements of decision. The court adopted Defendants' proposal, and did not proceed to a jury trial.

Relevant here, the court determined: (i) Plaintiffs did not have a right of action to recover their voluntarily-incurred remediation costs; (ii) Plaintiffs failed to establish Defendants were liable, because, among other things, the range was excluded under the " 'consumer product in consumer use' " exception for facilities and they did not establish disposals, as needed for liability; (iii) Defendants established defenses based on the HSAA's permitted release and nonretroactivity provisions (with the nonretroactivity determinations foreclosing the need for a jury phase), the statute of limitations, and a contractual release; (iv) in an equitable allocation of liability, Plaintiffs would bear

---

4       Defendants cite the vacated district court opinion. Lower federal court opinions are not binding on this court, even on federal questions (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3), and this particular opinion is not otherwise persuasive.

6

100 percent of costs; and (v) in addition to costs being unavailable (in the absence of a right of action), many costs claimed by Plaintiffs were not recoverable for other reasons.[5]

Plaintiffs filed objections, which the trial court overruled. The court entered judgment for Defendants. Defendants filed motions for attorney fees and costs, which the court denied. Plaintiffs appealed the judgment, and Defendants appealed the fee and cost rulings.

The State of California submitted an amicus brief in the Ninth Circuit in the federal case, and we invited the Attorney General to submit an amicus brief in this appeal. The parties were invited to respond. The Attorney General submitted a brief on behalf of amicus curiae DTSC, and the parties filed briefs in response.

III.

DISCUSSION

A.      *Overview*

1.      *Standard of review*

When we review a statement of decision, "findings on questions of fact are reviewed under the substantial evidence standard." (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.) We "infer any factual findings necessary to support the judgment," unless a party filed objections. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494, 498.) We still "review[] the implied factual findings under the

---

[5]      The court addressed Plaintiffs' ability to proceed in its cost analysis, as grounds for denying all costs, but we view this as a threshold issue.

7

substantial evidence standard." (*Fladeboe v. American Isuzu Motors Inc*. (2007) 150 Cal.App.4th 42, 60.) "[C]onclusions of law are subject to independent review . . . ." (*Brewer*, at p. 936.) Only prejudicial error is grounds for reversal. (*Soule v. Gen. Motors Corp.* (1994) 8 Cal.4th 548, 573-574 (*Soule*); Cal. Const., art. VI, § 13.) "[T]rial error is usually deemed harmless in California unless there is a 'reasonabl[e] probab[ility]' that it affected the verdict. . . . '[P]robability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hosp. Inc. v. Superior Court* (1994) 8 Cal. 4th 704, 715, citation omitted (*College Hosp.*).)

As to the arguments by amicus DTSC, we accord due weight to its views. (See *People v. Snyder* (2000) 22 Cal.4th 304, 310 ["In its amicus curiae brief, the FPPC supports this view, which 'because of the agency's expertise . . . is entitled to great weight unless clearly erroneous or unauthorized' "]; *Cal. State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 52, fn. 3 [noting amicus had "special expertise in [the] area [citation] and therefore its interpretation of the meaning and legal effect of [the statute] '[was] entitled to consideration and respect by the courts,' " citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7].)[6]

---

[6] To the extent the parties raised points for the first time in their responses to the DTSC amicus brief that they could have addressed earlier (as opposed to simply addressing the DTSC's positions), we will not consider them. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 (*Shade Foods*); *County of Sonoma v. Superior Court* (2010) 190 Cal.App.4th 1312, 1326, fn. 10.)

2.    *Relevant environmental statutes*

In addition to the HSAA, two federal statutes are relevant here.  RCRA governs the disposal of solid and hazardous waste.  (42 U.S.C. § 6901 et seq.)  CERCLA, also known as "Superfund," provides authority to respond to releases and threatened releases of hazardous substances.  (42 U.S.C. § 9601 et seq; *Sierra Club v. Johnson* (N.D. Cal. 2008) 614 F.Supp.2d 998, 1000.)[7]  CERCLA "was designed to promote the ' "timely cleanup of hazardous waste sites" ' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."  (*Burlington Northern and Santa Fe Ry.* (2009) 556 U.S. 599, 602 (*Burlington Northern*).)  In 1981, California enacted the HSAA as "California's 'superfund' statute and the state's counterpart to CERCLA."  (*City of Lodi v. Randtron* (2004) 118 Cal.App.4th 337, 351 (*City of Lodi*); *ibid.* [HSAA's purposes include "provid[ing] for response authority for releases of hazardous substances that pose a threat to the public health or environment"].)  The HSAA became inoperative under a sunset provision in January 1, 1999.  (*City of Lodi*, at p. 345, fn. 4.)  In 1999, the HSAA was reenacted with no sunset date.  (Stats. 1999, ch. 23, §§ 2, 3.)  The HSAA utilizes CERCLA definitions except where the HSAA defines them or "the context requires otherwise."  (§ 25310.)

---

7    RCRA was an amendment to the Solid Waste Disposal Act and some courts refer to the acts interchangeably.  (See *Wilshire Westwood Assocs. v. Atlantic Richfield Co.* (9th Cir. 1993) 881 F.2d 801, 807 fn. 7.)  "Superfund" refers to the trust fund created by CERCLA (*Chubb Custom Ins. Co. v. Space Systems/Loral Inc.* (9th Cir. 2013) 710 F.3d 946, 968 (*Chubb*)), but also is used to refer to the law generally.

These are remedial statutes, and thus are "liberally construe[d] . . . in favor of their protective purpose." (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 532; *Safe Air For Everyone v. Meyer* (9th Cir. 2004) 373 F.3d 1035, 1049, fn. 5 (*Safe Air*) [recognizing RCRA as remedial statute]; *KN Energy, Inc. v. Rockwell Intern. Corp.* (D. Co. 1993) 840 F.Supp. 95, 98 (*KN Energy*) [noting CERCLA's " 'overwhelmingly remedial' statutory scheme"]; *City of Lodi*, *supra*, 118 Cal.App.4th at p. 350 ["We do not disagree with the City's assertion that HSAA is a remedial statute . . . ."].)

B.    *Plaintiffs had a right of action to recover voluntarily incurred costs*

Plaintiffs contend the court erred in concluding they could not proceed under the HSAA.  We agree.  Cost actions under the HSAA are governed by section 25363, subdivision (e) (hereafter § 25363(e)).  At the time of Plaintiffs' suit, this section provided (and still provides, in substantial part):

> "Any person who has incurred removal or remedial action costs in accordance with this chapter or the federal act may seek contribution or indemnity from any person who is liable pursuant to this chapter . . . .  An action to enforce a claim may be brought as a cross-complaint by any defendant in an action brought pursuant to Section 25360 or this section, or in a separate action after the person seeking contribution or indemnity has paid removal or remedial action costs in accordance with this chapter or the federal act. . . .  In resolving claims for contribution or indemnity, the court may allocate costs among liable parties using those equitable factors which are appropriate."[8]  (§ 25363(e).)

---

[8]    Section 25363(e) was amended in 2015, effective January 1, 2016, and relettered as section 25363, subdivision (d).  (Stats. 2015, ch. 458, § 2.)  Some of Plaintiffs' arguments turn on the pre-2016 text, and the parties agree that version applies.  Unless otherwise noted, we also address other HSAA provisions as they existed at the time of Plaintiffs' state court suit, filed in 2006.

10

Whether a party can seek voluntary costs under the HSAA presents a question of statutory interpretation, which we analyze de novo. (*Molenda v. Dept. of Motor Vehicles* (2009) 172 Cal.App.4th 974, 986 (*Molenda*).) In interpreting a statute, "our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.) Statutes " 'must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature.' " (*City of Poway v. City of San Diego* (1991) 229 Cal.App.3d 847, 858.) "[W]e look first to the words of the statute, ' "giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." ' . . . Although we give effect to a statute according to the usual, ordinary import of its language . . . , language that permits more than one reasonable interpretation allows us to consider 'other aids, such as the statute's purpose, legislative history, and public policy.' " (*Cortez v. Abich* (2011) 51 Cal.4th 285, 292, citations omitted (*Cortez*).)

The trial court found the absence of judicial action, and Plaintiffs' voluntary participation in the Assembly Bill No. 2061 process, precluded a right to contribution under the HSAA. The text of trial court's ruling is relevant, and we reproduce large sections of it:

> "The Court finds that HSAA contribution actions may not be brought where the remediation was conducted and approved under Chapter 6.65 ('AB 2061'), as is the case here. HSAA limits standing to bring a claim under Chapter 6.8 [the HSAA] to 'any person who has incurred removal or remedial action costs in accordance with *this chapter* or the federal act.' The reference to 'this chapter' is to Chapter

6.8 . . . . AB 2061 cleanups are not under Chapter 6.8, but are exclusively prescribed under Chapter 6.65 . . . ."  (Fn. omitted.)

"The Court . . . finds that the remedial action at issue was not compulsory.  The Court further finds that the weight of the evidence does not suggest [Plaintiffs] have been subject to any government judicial action by the DTSC which mandated the remediation of the shooting range.  [¶]  . . . [Plaintiffs'] HSAA claim . . . fails because there has been no qualifying action by the DTSC to invoke the contribution remedy contained in Chapter 6.8.  (Citation.)  All of [Plaintiffs'] damages . . . relate to a voluntary remediation conducted under Chapter 6.65 ('AB 2061').  The relief available under an AB 2061 cleanup is a certificate of completion and not contribution under Chapter 6.8 . . . ."

Plaintiffs contend the court erred because, under the plain meaning of the statute, no prior DTSC action is needed, and because the Assembly Bill No. 2061 process is no bar to HSAA recovery.  We agree.

We begin with the trial court's rulings, and conclude they do not actually address, much less resolve, Plaintiffs' ability to proceed under the HSAA.  First, the court addressed only contribution, not indemnity.  But the typical contribution scenario involves a prior judgment, and there is no dispute Plaintiffs incurred their costs voluntarily.  (See *U.S. v. Atlantic Research Corp.* (2007) 551 U.S. 128, 138 (*Atlantic Research*) [contribution traditionally refers to "right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share"]; *Coca-Cola Bottling Co. v. Lucky Stores, Inc.* (1992) 11 Cal.App.4th 1372, 1381 [contribution applies after debtor has paid more than pro rata share of judgment].)  Second, the Assembly Bill No. 2061 process simply allows parties to request designation of an agency to oversee remediation and to receive a certificate of completion limiting further government action.  (See § 25260 et seq.)  The court seems to suggest that

12

because this process results in a certificate, not a judgment, it cannot provide a basis for a contribution claim. This analysis again ignores the existence of indemnity. Further, we see no conflict in use of both the Assembly Bill No. 2061 process and the HSAA: the former does not address party cost recovery, and the latter imposes no bar on how a response action can commence. (Compare § 25260 et seq. with § 25300 et seq.)

We now turn to the issue the trial court left unanswered: whether the HSAA requires prior government action to seek indemnity.

The HSAA does not define indemnity. Black's Law Dictionary provides that "indemnity" is "[a] duty to make good any loss, damage, or liability incurred by another"; "[t]he right of an injured party to claim reimbursement for its loss, damage, or liability from a person who has such a duty"; and "[r]eimbursement or compensation for loss, damage, or liability in tort." (Black's Law Dict. (10th ed. 2014), p. 886, col. 2.) Identified types of indemnity include contractual, equitable, and statutory indemnity. (*Ibid.*) Contractual indemnity is "expressly provided for in an agreement." (*Ibid*; Civ. Code, § 2772.) Equitable indemnity permits "defendants . . . to seek apportionment of loss between the wrongdoers in proportion to their relative culpability" (*GEM Developers v. Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419, 426), and requires a joint legal obligation. (*Union Pacific Corp. v. Wengert* (2000) 79 Cal.App.4th 1444, 1447-1448.) Statutory indemnity is that "conferred by legislation." (Black's Law Dict., *supra*, at p. 886, col. 2.)

We interpret indemnity under section 25363(e) to be a grant of statutory indemnity for those who incur otherwise recoverable costs. This interpretation is consistent with

13

other California statutory regimes providing an indemnity right, without a contractual obligation or joint tortfeasor relationship, including employee reimbursement, conversion damages, and deposit transactions. (See Lab. Code, § 2802 [employer "shall indemnify his or her employee for all necessary expenditures" due to discharge of work]; *Machinists Auto. Trades Dist. Lodge v. Util. Trailers Sales Co.* (1983) 141 Cal.App.3d 80, 81 [addressing whether employee had "statutory right to indemnity" for tool loss]; Civ. Code, § 3336 [damages for conversion are either value of property, with interest, or "amount sufficient to indemnify the party injured for the loss"]; Civ. Code, § 1833 ["depositor must indemnify the depositary" for damages caused by and expenses incurred as to the item deposited].) We thus disagree with Defendants that the only types of indemnity are express and equitable indemnity, equitable indemnity is at issue here, and Plaintiffs do not qualify. The HSAA neither characterizes the indemnity provision as equitable, nor imposes requirements that would apply in that context.

None of the other language in section 25363(e) suggests there is any prior government action requirement. Meanwhile, other sections of the HSAA make clear no such requirement exists. (See, e.g., § 25356.1.5 [response action criteria; explains "[a]ny response action taken or approved pursuant to this chapter shall be based upon, and no less stringent than, all of the following requirements[,]" and does not require government action]; § 25360, subd. (c) [cost recovery in DTSC actions; costs are recoverable "either in a separate action or by way of intervention . . . in an action for contribution or indemnity," implying the possibility of an action initiated by a private party].)

14

We conclude the plain language of the HSAA does not require prior government action and, to the contrary, permits recovery of voluntarily incurred remediation costs. This interpretation is consistent with the legislative history, CERCLA, and the remedial purposes of these statutes. Section 25363(e) was expanded in 1988 to permit "[a]ny person" to seek contribution or indemnity. (Stats. 1988, ch. 1401, § 1, p. 4734; see, e.g., Health & Welf. Agency, Enrolled Bill Rep., Assem. Bill No. 3946 (1987-1988 Reg. Sess.) Sept. 8, 1988, p. 2 [bill would "more equitably extend[] the right to seek contribution and indemnity to all potentially liable parties" (emphasis in original)].)[9] Like the HSAA, CERCLA provides for two types of cost actions, cost recovery under CERCLA section 107 and contribution under CERCLA section 113. (42 U.S.C. §§ 9607, 9613.) A party that voluntarily remediates may seek cost recovery under CERCLA section 107. (See *Atlantic Research*, *supra*, 551 U.S. at p. 139, fn. 6 ["costs incurred voluntarily are recoverable only by way of [CERCLA ]§ 107(a)(4)(B)"].) Finally, the DTSC urges that precluding remediation costs for voluntary cleanups using the Assembly Bill No. 2061 process "could have significant negative consequences for the cleanup of contaminated sites." We find their explanation persuasive: "Responsible parties would be discouraged from undertaking voluntary cleanups . . . . This would eliminate substantial direct environmental benefits resulting from responsible parties expeditiously and voluntarily undertaking cleanups, rather than waiting for a government agency with

---

[9]     On our own motion, we take judicial notice of documents comprising the legislative history of section 25363(e). (Evid. Code, §§ 452, 459; see *In re Donovan L., Jr.* (2016) 244 Cal.App.4th 1075, 1088.)

15

finite resources to either order the same action or to itself clean up the contamination with taxpayer money."

A property owner who voluntary remediates can seek indemnity for response costs under the HSAA. Use of the Assembly Bill No. 2061 process does not preclude such recovery.

## C.   *Plaintiffs established HSAA liability*

The trial court concluded Plaintiffs did not establish any HSAA liability. Plaintiffs assert the court primarily erred in two respects: applying the consumer product in consumer use exception to find the range was not a facility, and finding they did not establish a disposal, on various grounds. We conclude the court misapplied the consumer product exception, and some, but not all, of its disposal rulings were in error.

### 1.   *Overview of HSAA liability*

We begin by describing the elements of an HSAA claim, which will provide context for Plaintiffs' facility and disposal arguments.

Under the HSAA, costs can be recovered from a liable person. (§ 25363(e).) A " 'liable person' " means "those persons described in [CERCLA] section 107(a)." (§ 25323.5, subd. (a)(1).) To establish liability under CERCLA, and thus the HSAA, the plaintiff must establish " '(1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term . . . 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the

16

national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of [CERCLA] section 107(a).' " (*Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 870-871, citations omitted (*Carson Harbor I*) [en banc]; *Gregory Village Partners, L.P. v. Chevron U.S.A., Inc.* (N.D. Cal. 2011) 805 F.Supp.2d 888, 897 (*Gregory Village*) ["A claim under the HSAA has the same elements as a claim under CERCLA."].)  One class of liable persons covers "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  (42 U.S.C. § 9607(a)(2).)

>    2.    *The shooting range was not a consumer product in consumer use*

>        a.    *Applicable law*

CERCLA defines a " 'facility' " as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel."  (42 U.S.C. § 9601(9).)

CERCLA does not define "consumer product in consumer use."  However, the Seventh Circuit and Fifth Circuit have concluded that a facility must *be* a "consumer product in consumer use" to qualify for this exception.  (*Amcast Indus. Corp. v. Detrex Corp.* (7th Cir. 1993) 2 F.3d 746, 750 (*Amcast*) [discussing tanker trucks:  "The

17

exception is for facilities that *are* consumer products in consumer use, not for consumer products contained in facilities. Although read as it is written the exception is narrow, it is not meaningless, for the statute defines 'facility' so broadly that it could be thought to include a can of lye . . . . A literal interpretation that furthers the statute's purpose is hard to beat."]; *Uniroyal Chem. Co., Inc. v. Deltech Corp.* (5th Cir. 1998) 160 F.3d 238, 240, 253-254 (*Uniroyal*) [addressing tanker truck and trucking terminal; agreeing with *Amcast*'s literal approach and finding legislative history supported this literal reading]; see *Am. Internat. Specialty Lines Ins. Co. v. U.S.* (Fed. Cl., Jan. 31, 2008, No. 05-1020 C) 2008 WL 1990859, at p. *30 [addressing claim under law incorporating CERCLA facility definition]; *id*. at p. *32 [finding "shared rationale of the Fifth and Seventh Circuits to be persuasive"].)

The Fifth Circuit also concluded in *Uniroyal* that a " 'consumer product in consumer use' means any good normally used for personal, family, or household purposes, which was being used in that manner when the subject release occurred," and that neither the truck nor trucking terminal at issue there qualified. (*Uniroyal*, *supra*, 160 F.3d at p. 257.) *Uniroyal* noted, among other things, the legislative history, which reflected a focus on consumers and retail settings. (See, e.g., *id.* at p. 256 [Sen. Com. on the Envrt. and Pub. Works Rep. No. 99–11, 11 (1985) [describing " 'finished consumer products such as those that might be found in a retail store, where such products do not present a threat of release from a facility' " as " 'consistent with the definition of a 'facility' contained in . . . CERCLA, and its reference to consumer products' "].) Other courts have embraced a consistent interpretation. (See, e.g., *Emergency Servs. Billing*

18

*Corp. v. Allstate Ins. Co.* (7th Cir. 2012) 668 F.3d 459, 468 (*Emergency Servs.*) [personal motor vehicles were consumer products in consumer use]; *KN Energy*, *supra*, 840 F.Supp. at p. 99 [exception did not apply to company pipelines, because a "commercial business [was] involved, not individual consumers]; *Reading Co. v. City of Phila.* (E.D. Pa. 1993) 823 F.Supp. 1218, 1233 (*Reading Terminal*) [exception did not apply to railcars].)[10]

Consumer use of a commercial facility does not render it a consumer product. (See *CP Holdings, Inc. v. Goldberg-Zoino & Assoc., Inc.* (D.N.H. 1991) 769 F.Supp. 432, 439 (*CP Holdings*) [hotel was not a consumer product: "If the court were to accept [this] definition of a facility, any commercial building or property that could be bought or sold would have to be classified as a consumer product if the property is used by the general public. This would effectively exclude all private actions against previous landowners, despite the fact that [CERCLA] clearly provides for such actions."]; *Reading Terminal*, *supra*, 823 F.Supp. at p. 1235 [rejecting argument that consumer use of terminal rendered the "entire area" a consumer product].)

Finally, like other statutory exceptions, the consumer product exception must be construed narrowly. (See *San Diego Union v. City Council* (1983) 146 Cal.App.3d 947, 954 ["express exceptions" are "strictly and narrowly construed"]; *In re: Sept. 11 Lit.* (2d Cir. 2014) 751 F.3d 86, 91 (*Sept. 11 Lit.*) ["[CERCLA's] several exceptions . . . are

---

[10]    *Uniroyal*, *supra*, 160 F.3d at page 257, and *Emergency Servs.*, *supra*, 668 F.3d at page 468, cited EPA comments and rules suggesting the EPA would take a similar position.

generally read narrowly]; *Amcast*, *supra*, 2 F.3d at p. 750 [describing consumer product exception as "narrow"].)

b. *Analysis*

The trial court found Defendants established "the shooting range at issue was a 'consumer product in consumer use' within the meaning of the HSAA." The trial court also found the lead pellets, spent ammunition, targets, and fill material were consumer products in consumer use. The court explained: "The weight of the evidence establishes that the shooting range was at all times operated as a recreational facility for the consuming public. . . . Lead ammunition and clay targets were consumer products used by ordinary consumers for target practice, and those items came to be located at the shooting range during consumer use. In addition, the range itself was a consumer product, including [the stations] which were constructed with the white fill material . . . ." The court noted the shot and targets were for sale at the range, and the same type as those sold in sporting goods stores. Finally, the court rejected certain contentions by Plaintiffs below, including that "the exception does not apply to physical locations." According to the court, this argument was rejected in *Kane v. United States* (8th Cir. 1994) 15 F.3d 87 (*Kane*).

Plaintiffs contend the trial court erred in applying the consumer product exception, because the exception applies to consumers using consumer products, not commercial properties used by consumers. We agree. First, the court erroneously addressed whether various materials *contained* in the facility (e.g., targets) were consumer products in consumer use, when the exception only applies to facilities that *are* consumer products.

20

(*Amcast*, *supra*, 2 F.3d at p. 750; *Uniroyal*, *supra*, 160 F.3d at pp. 252-253.)[11]  Second, the court focused on consumer use of the range to find the exception applied, an interpretation rejected by the courts.  (See *CP Holdings*, *supra*, 769 F.Supp. at p. 439; *Reading Terminal*, *supra*, 823 F.Supp. at p. 1235.)  The court thus failed to address whether the range was a good used for personal, family, or household purposes. (*Uniroyal*, at pp. 252-253, 257.)  It plainly was not.

    We briefly explain why *Kane* is inapposite.  *Kane* relied on *Dayton Independent School Dist. v. U.S. Mineral Products Co.* (5th Cir. 1990) 906 F.2d 1059, 1065-1066, to conclude a home constructed with asbestos was a consumer product.  (*Kane*, *supra*, 15 F.3d at pp. 89-90, citing *Dayton*, at pp. 1065-1066 [asbestos incorporated into school building was consumer product].)  The Fifth Circuit has limited *Dayton* to its context. (*Uniroyal*, *supra*, 160 F.3d at pp. 250-252 [explaining *Dayton* involved "a single, narrow issue:  . . . whether CERCLA afforded a remedy in asbestos removal cases," and that its comments on the consumer exception were unnecessary to the holding, "expressed without citation to any specific legislative history," and "cannot reasonably be viewed as a definitive statement on the meaning of that exception"].)  *Dayton* provides no guidance

---

11    The trial court did not suggest the items at the range are facilities.  "Facility within a facility" cases present a special situation, and there is no indication any party has alleged it applies here.  (See, e.g., *Nurad, Inc. v. William E. Hooper & Sons Co.* (4th Cir. 1992) 966 F.2d 837 (*Nurad*) [storage tanks were separate CERCLA facility from land].)

here, and neither does *Kane* — even if it addressed a commercial property, which it does not.[12]

Finally, Defendants maintain the cases and legislative history support application of the exception to business use. *Uniroyal* distinguished these cases, and we find its reasoning persuasive. (See *Uniroyal*, *supra*, 160 F.3d at pp. 256-257.) As for the legislative history, Defendants cite *CP Holdings*. This case discussed both the " 'finished consumer products' " legislative comments noted in *Uniroyal* and business concerns that, absent an exception, companies that use hazardous substances could be liable under CERCLA. (*CP Holdings*, *supra*, 769 F.Supp. at p. 439.) However, on the latter point, *CP Holdings* identifies only a report "from . . . business organizations" (*id*., at fn. 6 [citing 1986 SARA Leg. Hist. 27, at 551]). The broader legislative history reflects consumers, quite reasonably, were the focus of the consumer product exception. (*Uniroyal*, at pp. 256-257; see also *KN Energy*, *supra*, 840 F.Supp. at p. 99; *Reading Terminal*, *supra*, 823 F.Supp. at p. 1233.)

This issue does not present a close question. The "consumer product in consumer use" exception does not apply to a commercial shooting range.[13]

---

[12]   The trial court also questioned, among other things, Plaintiffs' purported reliance on military and police ranges, apparently referencing EPA cases cited in their closing trial brief. The EPA cases appeared to involve at least some private parties. (See, e.g., *U.S. v. Lake Geneva Assocs.* (E.D. Wis., Sep. 30, 1998, No. 98-C-0972) 1998 EPA Consent Lexis 221 [defendants included corporations].) In any event, the case law provides some insight into the EPA's perspective, and it is consistent with Plaintiffs' position. (*Uniroyal*, *supra*, 160 F.3d at p. 257; *Emergency Servs.*, *supra*, 668 F.3d at p. 468.)

3.    *Plaintiffs established certain disposals by Defendants*

The trial court concluded Plaintiffs did not establish disposals with respect to the lead shot and target debris on the range (including because the targets fell under the HSAA's petroleum exclusion), the white material, disking, and the wood pile.  Plaintiffs contend these disposals did occur, because the contaminants were discharged or otherwise placed onto the land and these materials were solid waste.  We conclude they establish error as to the shooting range, the petroleum exclusion, and the white material.

a.    *Applicable law*

Under CERCLA, "disposal" is defined by reference to RCRA.  (*Carson Harbor I*, *supra*, 270 F.3d at p. 875, citing 42 U.S.C. § 9601(29).)  Under RCRA, a " 'disposal' " is "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  (42 U.S.C. § 6903(3); *Carson Harbor I*, at p. 879 [describing inquiry in CERCLA disposal analysis as

_____

13    Plaintiffs also contend the court failed to address whether the Property was a facility, before reaching the consumer product exception.  We agree the court failed to meaningfully address whether Plaintiffs established a facility in the first instance.  The court did summarily conclude they failed to prove the "range . . . was a 'facility,' "  but its findings and analysis focused entirely on the consumer product exception.  In light of Plaintiffs' objection below, we will not imply findings to support this conclusion.  However, the court's focus on the range, as opposed to the Property, appears to be harmless.  Plaintiffs do not establish the court's consumer product analysis was impacted by not focusing on the Property, and that analysis was in error regardless.

23

"examin[ing] each . . . term[]" in RCRA's disposal definition and "determin[ing] whether the movement of contaminants is, under the plain meaning of the terms, a 'disposal' "].)

" '[S]olid waste' " is defined, in relevant part, as "any . . . discarded material, including . . . material resulting from industrial, commercial, mining, and agricultural operations, and from community activities." (42 U.S.C. § 6903(27).) The Ninth Circuit has applied the following factors to assess whether a material is solid waste: "(1) whether the material is 'destined for beneficial reuse or recycling in a continuous process by the generating industry itself,' . . . ; (2) whether the materials are being actively reused, or whether they merely have the *potential* of being reused . . . ; (3) whether the materials are being reused by its original owner, as opposed to use by a salvager or reclaimer . . . ." (*Safe Air*, *supra*, 373 F.3d at p. 1043, citations omitted.)

> b. *Plaintiffs established a disposal based on Defendants' failure to reclaim spent lead and target debris that accumulated in the environment*

Plaintiffs contend Defendants left the spent shot and targets to accumulate, the materials became solid waste at some point, and the changes in ownership, without removal of the materials, meant the transformation to solid waste occurred by the time of those changes. This position is consistent with applicable authority and the trial court erred in rejecting it.[14]

---

14      We note Plaintiffs use the term "abandonment" to describe Defendants' conduct. We gather they use it in the ordinary, rather than technical sense, but we avoid its use in order to minimize confusion. Abandonment is a concept associated with the RCRA regulatory definition of solid waste, which, as we shall explain, is inapplicable here.

24

i. *Additional facts*

We briefly describe the history of range management, which is relevant to our disposal analysis. UEI employee Thomas Eley managed the range between 1965 and 1968, followed by UEI lessee Phil G. Scott from 1968 to 1978. They recovered some, but not all, spent lead shot, with Scott last reclaiming lead in 1975 or 1976. Scott testified he tried to retrieve more lead when he left in 1978, the last time the range was open during UE ownership, but had to leave it. No efforts were made to recover target debris, although Eley did attempt to chop and cover the targets. Baldwin's lessee Ray M. Enniss operated the range from 1990 to 1997, including for several months after Baldwin transferred the Property to the Estate. Enniss's lease required him to remove the materials. Again, though, only some lead shot was recovered (with Enniss last reclaiming lead in 1996), and no target debris. When the Estate terminated his lease in 1997, he could not remove the materials in the time provided by the Estate and the Estate's attorney, B. Suzanne Farley, declined his request to return.[15]

ii. *Applicable law*

Spent lead and target debris on a shooting range can become solid waste if left to accumulate. In *Connecticut Coastal Fishermen's Ass'n. v. Remington Arms Co.* (2d Cir. 1993) 989 F.2d 1308 (*Connecticut Coastal*), a gun club had been in use for 70 years and

---

[15] Based on testimony about the amount of lead shot used, and its typical weight, Plaintiffs represent hundreds of thousands of pounds of lead went unrecovered, and Defendants do not dispute this. We need not focus on the amount, as there is no dispute both sets of Defendants left at least some lead and target debris.

no spent shot or target debris had been removed. (*Id.* at p. 1310.) The court noted RCRA did not define " 'discarded material' " and "this create[ed] an ambiguity . . . : At what point after a lead shot is fired at a clay target do the materials become discarded?" (*Id.* at p. 1314.) After noting the legislative history did not resolve this ambiguity, the court looked to the RCRA regulations and the EPA's input as amicus. (*Id.* at p. 1314.) The regulations apply a narrower definition of solid waste " 'to wastes that also are hazardous for purposes of the regulations implementing Subtitle C of RCRA,' " while providing the statutory definition "applies to 'imminent hazard' lawsuits brought by the United States." (*Ibid.*) The court found the broader statutory definition applied to imminent hazard citizen suits, too. (*Id.* at p. 1315.) The EPA found the shot and targets did not fit the regulatory definition, but did come within the statutory definition because they were discarded. (*Id.* at pp. 1314-1316; *id.* at p. 1316 "[T]he EPA states that the materials are discarded because they have been 'left to accumulate long after they have served their intended purpose.' "].)

The court agreed: "Without deciding how long materials must accumulate before they become discarded — that is, when the shot is fired or at some later time — we agree that the lead shot and clay targets . . . have accumulated long enough to be considered solid waste." (*Connecticut Coastal*, *supra*, 989 F.2d at p. 1316; see also *Benjamin v. Douglas Ridge Rifle Club* (D. Or. 2009) 673 F.Supp.2d 1210, 1221-1222 [lead shot accumulated at a rifle club over 54 years; acknowledging that firing munitions is not itself a disposal, but "[f]ifty-four years of lead accumulation is more than long enough to be considered solid waste".)

The EPA took a consistent view in its *Best Management Practices for Lead at Outdoor Shooting Ranges*, EPA-902-B-01-001, at page I-8 (June 2005) (*Best Management Practices*) <https://www.epa.gov/lead/best-management-practices-lead-outdoor-shooting-ranges-epa-902-b-01-001-revised-june-2005> (as of Sep. 22, 2017).[16] Citing *Connecticut Coastal*, the EPA stated gun clubs are "at risk of legal action under RCRA if they fail to routinely recover and reclaim lead, do not take steps to minimize lead release or migration, or if they abandon lead in berms." (*Best Management Practices*, at pp. I-6 to I-7.) The EPA explained: "Lead shot is not considered a hazardous waste subject to RCRA at the time it is discharged from a firearm because it is used for its intended purpose. As such, shooting lead shot (or bullets) is not regulated nor is a RCRA permit required to operate a shooting range. However, spent lead shot (or bullets), left in the environment, is subject to the broader definition of solid waste written by Congress . . . ." (*Id*. at p. I-8.)

### iii. *Analysis*

The trial court observed RCRA's disposal definition applied, and determined Plaintiffs "failed to establish that actionable 'disposals' occurred." The court found there was no abandonment of either the range or the materials, noting, among other things, that "lead shot was reclaimed on numerous occasions," and the EPA's position that "ordinary use of lead shot on a shooting range does not fall within the regulatory definition of solid

---

16 The guide "was developed by EPA Region 2 in cooperation with a few states as well as many EPA offices." (*Best Management Practices*, *supra*, Notice.)

27

waste." The court also found there was no disposal when Defendants sold the Property, because the transfer of property is not a disposal. Instead, the court found "the lead shot and broken targets at issue were historically distributed on the range as a part of recreational activities, and not as a result of waste disposal." The court explained "the Ninth Circuit has held that the act of using a product in its intended fashion does not constitute a disposal of that product as waste, citing *3550 Stevens Creek Assocs. v. Barclays Bank* (9th Cir. 1990) 915 F.2d 1355 (*3550 Stevens Creek*) and *A & W Smelter and Refiners v. Clinton* (9th Cir. 1998) 146 F.3d 1107 (*A & W Smelter*).

Plaintiffs contend the court erred by focusing on the materials' use at the time of discharge; the "relevant inquiry [was] whether Defendants . . . allowed the contaminants to 'accumulat[e] long enough to be considered solid waste,' " and the Property transactions rendered "inescapable" the conclusion that the transformation to solid waste had occurred. Plaintiffs also contend the court erred in focusing on whether the products were useful, because "[t]hese contaminants were not serving any 'use,' and were never reclaimed and put to another use by Defendants." We find Plaintiffs' arguments persuasive.

First, the court's analysis failed to address whether the spent shot and target debris met the statutory definition of solid waste (and, to the extent it did focus on the issue, it relied on the inapplicable regulatory definition). Plaintiffs objected to this portion of the Statement of Decision, we will not infer the court made such findings, and the undisputed facts support Plaintiffs' position, anyway. The critical issue is whether the materials were destined for reuse, or whether they had been left to accumulate. (*Safe Air*, *supra*, 373

28

F.3d at p. 1043; *Connecticut Coastal*, *supra*, 989 F.2d at p. 1316.) Here, the record

supports only the latter conclusion: each set of Defendants recovered only some lead, no

target debris, and did not remove remaining materials before selling or transferring the

Property (thus foreclosing, at least presumptively, further reclamation). The issues the

trial court did address are irrelevant. Defendants' intentions toward the range have no

bearing on whether disposals took place, especially as they failed to recover lead and

targets even while the range was operational. There is no dispute some lead was

recovered; the problem is that much was not (and that no targets were, either). Finally,

although the "mere sale of property . . . is not a disposal" (*Sycamore Indus. Park Assocs.*

*v. Ericsson* (7th Cir. 2008) 546 F.3d. 847, 851), that is not Plaintiffs' position. Their

point is that the ownership changes make clear that Defendants were not going to reclaim

the materials they had left to accumulate and, thus, that the disposals occurred by the time

of those changes.[17]

Second, the useful product doctrine is inapposite. In *3550 Stevens Creek*, the

Ninth Circuit concluded that asbestos in a commercial building was not discarded

because it was "used to construct the building." (*3550 Stevens Creek*, *supra*, 915 F.2d at

p. 1361.) In *A & W Smelter*, the Ninth Circuit applied this concept to unprocessed ore

---

[17]    Plaintiffs suggest *Nurad* reflects that when a company closes with facilities
containing hazardous waste, this constitutes a disposal. (*Nurad*, *supra*, 966 F.2d at p. 847
["[T]here clearly was a disposal . . . when the Company closed down the finishing plant
and abandoned the tanks."].) But *Nurad* had concluded the tanks were disposed of prior
to sale, and made this observation in the alternative. (*Ibid*.) *Nurad* nevertheless
illustrates the relevance of a sale, insofar as it reflects an absence of intent for further use.

29

and determined there was a triable issue as to whether the ore was a useful product. (*A & W Smelter*, *supra*, 146 F.3d at pp. 1112-1113; *id.* at p. 1113 ["[i]f the ore was mixed with enough slag so that it was no longer usable . . . , then it was waste"].) Here, although the lead shot and targets were useful at some point, the materials at issue are the spent lead and target debris left to accumulate. (See, e.g., *Levin Metals Corp. v. Parr-Richmond Terminal Co.* (N.D. Cal. 1991) 781 F.Supp. 1448, 1452 & fn. 3 (*Levin*) [explaining the issue was "not the DDT that was put to productive use, but rather the DDT that was released into the environment," and finding *3550 Stevens Creek* inapposite].)

We address two issues raised by Defendants. First, they suggest *Cordiano v. Metacon Gun Club, Inc.* (2nd Cir. 2009) 575 F.3d 199 should guide our analysis. *Cordiano* confirms range materials are not regulatory solid waste (which is not in dispute), but does not reach the statutory solid waste question. (*Id.* at pp. 205-206, 209 [plaintiffs failed to raise material issue on imminent and substantial endangerment, so court did not need to reach whether lead had been " 'discarded' within the meaning of the statutory definition"].) Second, Defendants contend " 'imminent and substantial endangerment' is required to prove RCRA statutory waste." Setting aside their mischaracterization of RCRA, we disagree. The use of the broader statutory definition in

both RCRA endangerment claims and under CERCLA does not render the elements of the RCRA claims applicable to CERCLA (or, in turn, the HSAA).[18]

Although we decline to identify when the spent lead and target debris became solid waste, we conclude Plaintiffs established this transformation occurred during Defendants' ownership periods. The trial court erred in finding no disposals.

      c.       *The trial court applied the wrong burden of proof in applying the petroleum exclusion to the target debris*

The court found Plaintiffs failed to establish the HSAA petroleum exclusion did not apply to the target debris. Plaintiffs contend the court erred by placing the burden of proof on them, rather than Defendants. We agree.

As noted *ante*, PAH's on the Property were attributed to the target debris. Plaintiffs contend PAH's are hazardous substances under the HSAA. (§ 25316, subd. (d).) Section 25317 provides that " '[h]azardous substance' " does not include "[p]etroleum, including crude oil or any fraction thereof . . . ." CERCLA has an analogous exclusion. (42 U.S.C. § 9601(14).) "[H]azardous substances which are contained in and are indigenous to petroleum or are added as a constituent during the refining process" fall within the exclusion. (*Nixon-Egli Equip. Co. v. John A. Alexander Co.* (C.D. Cal. 1996) 949 F.Supp. 1435, 1442 (*Nixon-Egli*).)

---

18    Defendants also cite *Catellus Dev. Corp. v. U.S.* (9th Cir. 1994) 34 F.3d 748, 750, for the proposition that disposal refers " 'to an affirmative act of discarding a substance as waste, and not the productive use of the substance.' " Even assuming their conduct was not affirmative, the Ninth Circuit has since "reject[ed] the absolute binary 'active/passive' distinction." (*Carson Harbor I*, *supra*, 270 F.3d at p. 879.)

31

The party claiming the exclusion bears the burden of proof. (*Nixon-Egli*, *supra*, 949 F.Supp. at p. 1443 ["the petroleum exclusion is a statutory exception and, as is the case with other statutory exceptions, the party seeking to invoke the exception bears the burden of proof on it[s] applicability"]; *Ekotek Site PRP Comm. v. Self* (D. Utah 1996) 932 F.Supp. 1319, 1323 [accord].) And, as with other exceptions, it is narrowly construed. (*Sept. 11 Lit.*, *supra*, 751 F.3d at p. 91.)

Here, the trial court found the petroleum exclusion "applie[d] to the component of the target which is petroleum since all the PAH[']s detected at the site were indigenous to the petroleum pitch component of the target." The court found the evidence established the targets were made of nonhazardous clay and petroleum pitch, citing various witnesses and reports. The court concluded that "[s]ince [Plaintiffs] failed to present any evidence that the PAH[']s came from any other source than the petroleum pitch contained in the targets, the exclusion contained in . . . section 25317 applies . . . ."

Plaintiffs contend the court erred by requiring them to demonstrate the targets were not made of petroleum pitch. They explain that because Defendants did not present evidence the targets at the range were made of petroleum, they had no need to introduce evidence the targets were made of coal tar. Plaintiffs also argue there was no substantial evidence to support the court's finding that the targets were made of petroleum pitch,

32

explaining the evidence showed only that the targets were made of pitch (not petroleum pitch) or addressed targets generally, not those actually used at the range.[19]

We agree the trial court erred by placing the burden of proof on Plaintiffs. (See *Nixon-Egli*, *supra*, 949 F.Supp. at p. 1443.) The court should have addressed whether Defendants established the targets used on the range were made of petroleum pitch, not whether Plaintiffs proved the PAH's came from elsewhere (or, as Plaintiffs put it, that the targets were not made of petroleum pitch). We conclude Plaintiffs have a reasonable chance of prevailing if the burden is properly applied. (*College Hosp.*, *supra*, 8 Cal.4th at p. 714.)

> d. *The trial court erred in finding use of the white material was not a disposal*

Plaintiffs contend use of the perchlorate-containing white material constituted a disposal. The trial court found Plaintiff failed to establish a disposal based on use of the white material because it "was emplaced on the range solely as a construction material to expand the range, and was not deposited there as waste," citing *3550 Stevens Creek*, *supra*, 915 F.2d 1355. Plaintiffs maintain use of the white material was a disposal, and their position has merit. Even assuming the white material were a useful product at some point, *3550 Stevens Creek* remains distinguishable. A disposal requires that the material

---

[19]    Plaintiffs also suggest evidence cited by the court here was hearsay, but they do not establish they objected below or offer any argument here. They have forfeited this argument. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [" '[E]very brief should contain a legal argument with citation of authorities . . . . If none is furnished on a particular point, the court may treat it as waived . . . .' "].)

33

enter the environment.  (42 U.S.C. § 6903(3).)  In *3550 Stevens Creek*, the court noted

not only that the asbestos at issue was used in construction, but also that "there is no

indication that materials containing asbestos installed as part of the structure of a

building, as here, are such that asbestos fibers 'may enter the environment.' "  (*3550*

*Stevens Creek*, at p. 1362.)  Here, in contrast, the white material already *was* in the

environment.  *California v. Blech* (9th Cir. 1992) 976 F.2d 525, 527, footnote 1, cited by

Defendants, is distinguishable for the same reasons.  (*Id.* at p. 527, fn. 2 [involving a

release within a structure].)[20]

> e.  *Plaintiffs do not establish disking resulted in disposal*

Plaintiffs contend each instance of disking was a disposal, and the trial court erred

in concluding otherwise.  They do not establish error.

Disposal can encompass subsequent movement of contaminants.  In *Kaiser*

*Aluminum & Chemical Corp. v. Catellus Dec. Corp.* (9th Cir. 1992) 976 F.2d 1338

(*Kaiser*), the Ninth Circuit found allegations that a party "excavated . . . tainted soil,

moved it away from the excavation site, and spread it over uncontaminated portions of

the [P]roperty" sufficient to support disposal.  (*Id.* at p. 1342 [reversing grant of motion

to dismiss CERCLA claim].)  The court explained:  "[T]he term 'disposal' should not be

limited solely to the initial introduction of hazardous substances onto property.  Rather,

---

[20]  Defendants also contend Plaintiffs "agreed the white material was 'non-hazardous,' " citing evidence relating to this issue.  We will not infer this evidence reflects the white material was not hazardous for disposal purposes, given the court did not reach the issue and Plaintiffs objected to the court's failure to address whether perchlorate was a hazardous substance (and related cost findings).

34

consistent with the overall remedial purpose of CERCLA, 'disposal' should be read broadly to include the subsequent 'move[ment], dispers[al], or release[] [of such substances] during landfill excavations and fillings.' " (*Ibid.* ["CERCLA's definition of 'disposal' expressly encompasses the 'placing of any . . . hazardous waste . . . on any land.' "]; see *Tanglewood East Homeowners v. Charles-Thomas, Inc.* (5th Cir. 1988) 849 F.2d 1568, 1573 [affirming denial of motion to dismiss claim against developer that, among other things, dispersed contaminated soil throughout subdivision]; *Redwing Carriers, Inc. v. Saraland Apartments* (11th Cir. 1996) 94 F.3d 1489, 1510 (*Redwing*) [disposal includes "subsequent movement and dispersal"].)

Notwithstanding this broad view of disposal, the Eleventh Circuit concluded that returning soil to the same place did not constitute a disposal. (*Redwing*, *supra*, 94 F.3d at pp. 1510, 1511 [record lacked evidence that gas line work "resulted in a movement of contaminated soil"; "[T]he only reasonable inference is that any soil dug up during the process was returned from whence it came. No matter how broadly the term is defined, this conduct did not amount to a 'disposal.' "].)

The trial court determined Plaintiffs failed to establish disking constituted a disposal. The court explained: "Cases discussing the excavation and re-distribution of contaminated soil are inapt. (*E.g.*, [*Kaiser*[, *supra*,] 976 F.2d 1338, 1342.) In this case, disking did not involve (1) excavation of the soil; (2) movement of soil to other portions of the range; and (3) spreading contaminated soil over uncontaminated portions of the [P]roperty." The court found "the mere action of rotating soil and returning it to the same place" is not a disposal, and the evidence established disking "simply turns over soil and

35

did not expand the area of soil contamination."  The court also noted disking was performed for weed abatement and fire prevention, not disposal.  For HSAA nonretroactivity purposes (which we address *post*), the court also found the evidence to be unconvincing as to whether disking occurred after 1982, and alternatively found any such disking "did not enlarge the area or depth of soil contamination."

Plaintiffs contend the trial court made a legal error in concluding disking was not a disposal, and that there was no substantial evidence to reflect certain findings as to post 1982 disking.  We conclude Plaintiffs do not establish legal error, and need not reach their substantial evidence argument.  The court's references to excavation, movement to other areas, and spreading contamination track the allegations in *Kaiser*, reflecting it was applying the case and finding it distinguishable.  (*Kaiser*, *supra*, 976 F.2d at p. 1342.) Plaintiffs disagree, suggesting the disking resulted in soil movement and this was enough, citing *Kaiser*.  This argument has force, given *Kaiser*'s broad language.  (*Ibid.*)  But *Kaiser* did not actually find a disposal based on movement in place, and *Redwing* rejects this application.  (*Redwing*, *supra*, 94 F.3d at p. 1511.)  We do not hold that disking could never be a disposal, but simply that the court applied appropriate legal standards in concluding it was not a disposal here.[21]

---

[21]     We address two other issues raised by Plaintiffs.  First, they contend "[t]he effect of this disking was to bury surface contaminants deep into the soil," citing testimony by Eley.  Assuming they are suggesting disking did spread contamination, they failed to challenge the court's findings as to disking's impact on substantial evidence grounds and cannot establish error.  They also argue the purpose of the disking was irrelevant.  On that point, we agree. (*Coppola v. Smith* (E.D. Cal., Apr. 6, 2015,

f.    *Plaintiffs do not establish a disposal as to the wood pile occurred during the Baldwin Defendants' ownership period*

Plaintiffs contended the wood pile resulted in a disposal, and the trial court erred by erroneously requiring them to prove causation. They do not establish error.

The HSAA only applies to former owners who were owners "at the time of disposal." (42 U.S.C. § 9607(a)(2).) The trial court found Plaintiffs "failed to present evidence establishing any connection between the hazardous substances they found in 2005 to any disposal activity that took place during Baldwin's ownership." The court acknowledged the Plaintiffs "found the presence of various chemicals/metals at the wood pile," but observed the tests were conducted in 2005, eight years after the Baldwin Defendants' ownership ended, and that "[n]o evidence was presented that any [materials] . . . w[ere] ever present at the wood pile during Baldwin's ownership between 1988 and 1997." The court also found, among other things, that the Estate did not document the wood pile composition when it took ownership and concerns about illegal dumping led to a fence installation in 2002 or 2003. The court's analysis is sound. Hazardous substances may have been found in the area of the wood pile in 2005, but that does not establish, without more, that they were disposed of during the Baldwin Defendants' ownership.

Plaintiffs contend the trial court's reference to a "connect[ion]" meant the court "erroneously inserted a 'causation' element." We agree CERCLA, and thus the HSAA,

---

No. 1:11-cv1257-AWI-BAM) 2015 U.S. Dist. Lexis 45164, at p. *17 [owner at time of disposal can be liable, "regardless of intent"]; *Levin*, *supra*, 781 F.Supp. at p. 1451, fn. 1 [accord].)

does not require a plaintiff to establish "a direct causal connection between the defendant's hazardous substances and the release or the plaintiff's incurrence of response costs." (*U.S. v. Alcan* (3d Cir. 1992) 964 F.2d 252, 265.) The lack of that causal connection is an affirmative defense. (42 U.S.C. § 9607(b); Health & Saf. Code, § 25323.5, subd. (b).) But the trial court was not requiring Plaintiffs to show Baldwin caused anything. Rather, it found Plaintiffs did not establish a disposal as to the wood pile, by anyone, took place during the Baldwin Defendants' ownership.

Plaintiffs rely on cases involving generators or distributors. (See *U.S. v. Monsanto Co.* (4th Cir. 1988) 858 F.2d 160; *U.S. v. Wade* (E.D. Pa. 1983) 577 F.Supp. 1326; and *Cal. ex rel. Dept. of Toxic Substances Control v. Verticare, Inc.* (N.D. Cal., Mar. 1, 1993, No. C-92-1006 MHP) 1993 U.S. Dist. Lexis 3062.) This reliance is misplaced. Unlike former owner liability, generator liability is based on "arrang[ing] for disposal . . . of hazardous substances . . . at any facility . . . owned or operated by another party or entity and containing such hazardous substances." (42 U.S.C. § 9607(a)(3).) It was in this context that *Monsanto* held that a plaintiff need not "trace the ownership of each . . . compound found at a site" and "a showing of chemical similarity between hazardous substances is sufficient." (*Monsanto*, at p. 169.) *Wade* and *Verticare* involved similar issues as to generator and distributor defendants and likewise are unavailing. (*Wade*, at

p. 1332; *Verticare*, at p. *8.) All Plaintiffs needed to show was that a disposal took place during the Baldwin Defendants' ownership.[22]

D.      *The court erred with respect to Defendants' defenses*

The trial court concluded Defendants established defenses or other bars to liability based on the HSAA's permitted release provision, HSAA nonretroactivity (including tort arguments relating to that issue), the statute of limitations, and a contractual release. Plaintiffs challenge each ruling, and establish error as to each.

1.      *The permitted release exception did not apply to Defendants' permits*

Plaintiffs rely on Defendants' disposals to establish the releases required for liability. (42 U.S.C § 9601(22) [release includes "disposing into the environment"]; § 25320 [accord].) They contend the trial court erred by concluding Defendants' permits to operate and construct the range rendered these releases "permitted releases" under the HSAA. We agree.

a.      *Additional facts*

In 1965, San Diego County approved the grant of a permit to UEI "to construct and operate a skeet and trap club and range on Otay Ranch," as reflected in a letter from the board of supervisors to the sheriff and other correspondence (1965 Permit). The

---

[22] We recognize a plaintiff could rely on indirect evidence. (See, e.g., *Elf Atochem N. Am. v. United States* (E.D. Pa. 1993) 833 F.Supp. 488, 493 [denying summary judgment, where "record allow[ed] [the court] to reasonably infer that hazardous waste was disposed on the site during [d]efendant's tenure"].) But Plaintiffs did not challenge the court's ruling on substantial evidence grounds. For the same reason, we do not address their contention that there was "no dispute Baldwin did not completely remove the debris" or that debris was still present during their ownership.

permit itself does not appear to be in the record. In 1970, UEI lessee Scott applied for a special use permit. Although the permit is only somewhat legible, it appears he "request[ed] permission to build two . . . more trap houses." The County granted a five-year permit (1970 Permit). In 1983, UEI applied for a major use permit to "operate the Otay Gun Club." In the application, UEI stated: "Spent lead from the shot will be regularly mined and recycled . . . ." The County conditionally granted a 15-year use permit, which did not address lead or target recovery (1983 Permit).

        b.     *Applicable law*

Section 25366, subdivision (b) of the HSAA provides: "Nothing in this chapter shall be construed as authorizing recovery for response costs or damages resulting from any release authorized or permitted pursuant to state law or a federally permitted release." In section 25326, the HSAA defines " 'release authorized or permitted pursuant to state law' " as

> "any release into the environment which is authorized by statute, ordinance, regulation, or rule of any state, regional, or local agency or government or by any specific permit, license, or similar authorization from such an agency, including one of the foregoing, that recognizes a standard industry practice, including variances obtained from the agency which allow operations for facilities during a period of time when releases from the facilities do not conform with relevant statutes, ordinances, regulations, or rules. The term includes a federally permitted release, as defined by section 25325, and releases that are in accordance with any court order or consent decree."

CERCLA contains a similar exception (42 U.S.C. § 9607(j)), and defines "federally permitted release" to include various releases in compliance with permits under specified laws or other government authorization. (*Id*., § 9601(10); see *Barnes ex rel.*

*Estate of Barnes v. Koppers, Inc.* (5th Cir. 2008) 534 F.3d 357, 363, fn. 5 [federally permitted release is a "discharge pursuant to a permit issued under any of a variety of federal environmental laws"]; § 25325 [incorporating CERCLA definition of federally permitted release].)

The permitted release provision is an exception to the HSAA and, like its federal counterpart, must be interpreted narrowly. (*Sept. 11 Lit.*, *supra*, 751 F.3d at p. 91; *U.S. v. Freter* (9th Cir. 1994) 31 F.3d 783, 788 (*Freter*) [referring to federally permitted release as "narrow exception"].)[23] The burden is on the party seeking the exception, here Defendants. (See *Freter*, at p. 788 ["We conclude that the exception for federally permitted releases states an affirmative defense."]; *Nixon-Egli*, *supra*, 949 F.Supp. at p. 1443 [party seeking exception bears burden of proof].)

        c.    *Analysis*

The trial court determined Defendants established the "release of lead and targets into the environment at the site was authorized by the . . . permits issued in 1965, 1970, and 1983." The court explained: "The weight of the evidence establishes that [Defendants] operated the shooting range lawfully pursuant to those permits. Since the essence and effect of a permit to operate a shooting range is government approval of the

---

23    See *Pakootas v. Teck Cominco Metals, Ltd.* (9th Cir. 2016) 830 F.3d 975, 985, footnote 10 (" 'While the exemptions . . . for federally permitted releases are provided to give regulated parties clarity in their legal duties and responsibilities, these exemptions are not to operate to create gaps in actions necessary to protect the public or the environment.' 126 Cong. Rec. 30,897, 30,932-33 (Nov. 24, 1980) (statement of Sen. Randolph).").

use of firearms to hit and destroy targets, the 'release' of lead and target debris into the environment was allowed by the County's permits." The court further explained "[t]he permits were the 'specific permit' . . . that allowed shooting range operations to occur, during which lead pellets and clay targets were used for target practice, which is the purported 'release' activity for which [Plaintiffs] complain." The court also determined Defendants established that "importation of fill dirt (which contained naturally occurring white carbonate rock) to construct shooting stations . . . was authorized . . . pursuant to the 1970 [P]ermit."[24]

Plaintiffs contend the trial court erred in applying the exception, because the permits did not authorize the disposal of lead, PAH's (attributable to the target debris), or perchlorate. We agree. We start with the court's ruling, and conclude it failed to focus on the releases at issue. The court's assertion that Plaintiffs complained about "shooting range operations" and the use of "lead pellets and clay targets" simply ignores their position that the releases were Defendants' disposals (i.e., leaving the lead and targets, and use of perchlorate).

The threshold question is whether the HSAA's permitted release exception even could apply to permits that do not specifically address releases. We review this statutory interpretation issue de novo (*Molenda*, *supra*, 172 Cal.App.4th at p. 986), and begin with

_____

[24]    The court also found Scott had an oral extension after 1975. Plaintiffs disagree, but do not establish the evidence relied upon by the court was inadequate. Any error was also harmless; as we shall explain, Scott's 1970 Permit did not support a permitted release in the first place.

the text of the statute. The exception applies to "any release into the environment which is authorized by . . . any specific permit, license, or similar authorization . . . that recognizes a standard industry practice." (§ 25326.) The plain language of this provision reflects it is the *release* that must be authorized, not just the facility or operation with which the release is associated. None of the remaining language suggests any broader application and, to the contrary, narrows it further. The use of the word "specific" suggests the purpose (or, at least, a purpose) of the permit must be to authorize the release, thus precluding implied authorization. Finally, there must be a "recogn[ition] [of] standard industry practice." (§ 25326.) Again, the plain language of the statute makes clear this practice must, at minimum, relate to the release at issue.[25]

Having concluded the text is clear, we need go no further. (*Cortez*, *supra*, 51 Cal.4th at p. 292.) But we observe this interpretation is consistent with application of the federally permitted release exception and the HSAA's purpose. With respect to federally permitted releases, *Carson Harbor Village, Ltd. v. Unocal Corp.* (C.D. Cal. 2003) 287 F.Supp.2d 1118 (*Carson Harbor II*) is instructive. There, defendants faced CERCLA claims relating to "lead deposited . . . through storm[ ]water run-off," but had National Pollution Discharge Elimination System (NPDES) permits required to discharge storm water. (*Id.* at pp. 1126, 1138.) The court concluded storm water discharges after the defendants obtained NPDES permits did not support liability. (*Id.* at p. 1183.) Thus,

---

[25] Because we conclude *post* the permits here do not authorize the releases at issue, we need not address whether the permit must identify the standard industry practice, or whether the release simply needs to comply with it.

unlike here, the *Carson Harbor II* permits authorized the release at issue. As for the HSAA's remedial purpose, we agree with amicus DTSC that broader application of the exception to operational permits could have undesirable effects (such as municipalities inadvertently permitting releases) and thus impede remediation.

Turning to the permits here, Defendants do not contend, and the record does not reflect, the permits address the release activity about which Plaintiffs complain: leaving spent lead and target debris and use of perchlorate. Given these undisputed facts, and the narrow scope of the permitted release exception, there was no basis for the trial court to conclude that Defendants established permitted releases.[26]

We address Defendants' contention that no EPA permit is required for shooting ranges. As noted *ante*, the EPA has taken the position that no RCRA permit is required to operate a range. (*Best Management Practices*, *supra*, at p. I-8.) But both the EPA and courts have recognized that spent lead can become solid waste if left to accumulate, thus resulting in a disposal and release. (*Ibid*.; *Connecticut Coastal*, *supra*, 989 F.2d at p. 1316.) At that point, a permit would be necessary to avoid liability.

The permitted release exception applies only to permits that authorize releases, not to operational or construction permits that are silent as to such matters.

---

[26]   The 1970 Permit does not appear to address fill material, notwithstanding the court's finding that it did.

44

2.    *The trial court erred in applying HSAA's provisions on nonretroactivity*

Plaintiffs contend the trial court erred in applying HSAA nonretroactivity with respect to its HSAA and tort claims, and, in light of the latter determination, erroneously denied them a jury trial.  We agree the court erred and do not reach the jury issue.

a.    *Applicable law*

Section 25366, subdivision (a) of the HSAA provides:  "This chapter shall not be construed as imposing any new liability associated with acts that occurred on or before January 1, 1982, if the acts were not in violation of existing state or federal laws at the time they occurred."  The existing law provision limits HSAA nonretroactivity.  (See 1 Robie et al., Cal. Civ. Prac. Environmental Litigation (2002) § 3:90, p. 113 ["The HSAA does not impose new liability . . . , if the acts were not in violation of existing . . . laws or regulations. . . .  It is likely, however, that it was never legally permissible to release hazardous substances to the environment."]; see, e.g., *United Alloys, Inc. v. Baker* (C.D. Cal. 2011) 797 F.Supp.2d 974, 1005 [concluding § 25366, subd. (a) did not bar claim against operator of facility, because "it [was] likely that at least some of the contamination occurred prior to the passage of the HSAA but after the passage of [RCRA]."].)[27]

---

[27]    The trial court assumed Plaintiffs bore the burden of proof regarding retroactive application of the HSAA, while Plaintiffs suggest it is a defense.  We need not resolve this issue to address Plaintiffs' nonretroactivity arguments.

45

b. *The trial court erred in focusing on the shooting range closure in addressing nonretroactivity*

The trial court first determined the UE Defendants had no HSAA liability because their shooting range operations ceased in 1978, citing *Pentair Thermal Management, LLC v. Rowe Industries* (N.D. Cal., Mar. 31, 2013, No. 06-cv-07164 NC) 2013 U.S. Dist. Lexis 47390 (*Pentair*). As noted *ante*, the court also found no post-1982 disking supported HSAA liability.

Plaintiffs contend the court erroneously focused on the shooting range closure, when the conduct at issue was the UE Defendants' disposal. We agree. The issue is not when the range closed, but when the lead and target became solid waste. (*Safe Air*, *supra*, 373 F.3d at p. 1043; *Connecticut Coastal*, *supra*, 989 F.2d at p. 1316.) Although we declined to address when this took place (see discussion *ante*), we agree with Plaintiffs that it must have happened by the time UEL sold the Property in 1988. Thus, the disposal could have occurred between 1982 and 1988, in which case nonretroactivity is not at issue. On remand, the trial court must first determine when the disposal took place, and only then assess whether nonretroactivity is an issue. *Pentair* did not involve a post-1982 disposal and does not suggest a different result. (*Pentair*, *supra*, 2013 U.S. Dist. Lexis 47390, at p. *79 [defendant whose predecessors ceased operations in 1970 could not be liable for PCB (polychlorinated biphenyl) contamination under the HSAA,

where PCB's were not regulated until 1976].)[28]  As for disking, because Plaintiffs did not

establish the court erred in finding the disking did not constitute a disposal (as discussed

*ante*), we conclude the court did not err in determining post-1982 disking did not support

HSAA liability.

          c.       *The trial court erred in concluding Defendants were not in violation of existing nuisance and trespass law*

Plaintiffs contend that Defendants' acts of leaving lead and target debris, and use

of perchlorate-containing material, violated nuisance and trespass law.  The trial court

determined Plaintiffs' nuisance and trespass claims lacked merit because the 1965 Permit

barred them pursuant to Civil Code section 3482; the UE Defendants, as former owners,

consented to any alleged nuisance or trespass; and Plaintiffs consented to the state of the

Property.  Plaintiffs argue these determinations were in error, and we agree.

          i.       *Civil Code section 3482 did not bar Plaintiffs' claims*

Civil Code section 3482 provides that "[n]othing which is done or maintained

under the express authority of a statute can be deemed a nuisance."  A "narrow

construction" applies to section 3482.  (*Greater Westchester Homeowners Assn. v. City of

Los Angeles* (1979) 26 Cal.3d 86, 100 (*Greater Westchester*).)  Specifically, " ' "[a]

statutory sanction cannot be pleaded in justification of acts which by the general rules of

law constitute a nuisance, unless the acts complained of are authorized by the express

---

[28]    Plaintiffs contend disposal could not have occurred until after the 1983 Permit application, because Defendants represented therein that lead would be recycled.  We leave it to the trial court to consider this evidence on remand.

47

terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury." ' " (*Id.* at p. 101.)

The case law reflects this narrow application. (See, e.g., *Greater Westchester*, *supra*, 26 Cal.3d at p. 101 [rejecting argument that "because aviation and noise are necessarily inseparable, governmental approval . . . of aviation . . . necessarily implies legislative approval of aviation noise which results in interference with neighboring land uses"]; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 292 (*Varjabedian*) [Civ. Code, § 3482 did not bar liability as to emission of noxious odors from city's sewage treatment plant: "None of the . . . statutes under which the city claims to act mentions the possibility of noxious emanations from such facilities. Nor can we find that such odors were authorized by the 'plainest and most necessary implication' from the general powers there conferred."].)[29]

Here, the trial court found Plaintiffs' nuisance claim was barred under Civil Code section 3482. The court explained "[t]he word 'statute' in section 3482 is broadly interpreted to include authority given under government-issued permits," citing *Wheeler*

[29]    See also *Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123, 157 (electrical company could not rely on Civ. Code, § 3482 when owner sued due to stray currents entering home); *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* (2010) 190 Cal.App.4th 1502, 1532 (pesticides applied pursuant to permits migrated to plaintiff's farm: "[T]he permits authorized application of the pesticides to [defendant's] fields . . . ; they did not authorize application of pesticides or the damage to plaintiff's crop.").

*v. Gregg* (1949) 90 Cal.App.2d 348, 370 (*Wheeler*) and *Carson Harbor I*, *supra*, 270 F.3d at page 888. The court found the 1965 Permit "expressly authorized UE's shooting operations."[30]

The trial court erred both in construing Civil Code section 3482, and in applying it to the 1965 Permit. Section 3482 is interpreted narrowly, and *Wheeler* and *Carson Harbor I* do not suggest otherwise. Unlike here, those cases involved permits authorizing the nuisance at issue. (See *Carson Harbor I*, *supra*, 270 F.3d at p. 888 [under § 3482, NPDES permits authorizing storm water discharge precluded nuisance liability]; *Wheeler*, *supra*, 90 Cal.App.2d at pp. 368-370 [plaintiffs unsuccessfully sued to enjoin excavation by defendants with permit to conduct the work; court construed claim as one for anticipated nuisance and affirmed, citing § 3482, among other reasons].) The 1965 Permit did not authorize the nuisance activity at issue, either expressly or by necessary implication. (*Greater Westchester*, *supra*, 26 Cal.3d 86 at p. 101.)

Defendants' arguments are unpersuasive. They suggest the " 'essence and effect' " of a range permit is to authorize the release of shot and targets. Even assuming they were properly focused on the alleged nuisance, not range operations, courts reject these types of effect arguments in the absence of " ' "necessary implication." ' " (*Greater Westchester*, *supra*, 26 Cal.3d 86 at p. 101; see *Varjabedian*, *supra*, 20 Cal.3d at p. 292.)

---

30    The court found Civil Code section 3482 applied to trespass, too. As we conclude the court erred in applying the section at all, we need not address whether it applies to trespass.

There was nothing necessary about their decision not to retrieve all lead shot and target debris.

Defendants also contend the cases declining to apply Civil Code section 3482 (such as *Varjabedian*) are distinguishable because the parties there "exceeded the scope of the use permits," and we should instead follow *Carson Harbor I*, as well as *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1252, and *Avedon v. State of California* (2010) 186 Cal.App.4th 1336, 1345. We disagree. The courts declined to apply section 3482 because the conduct was unrelated to the permits, not because it exceeded them. (See, e.g., *Varjabedian*, *supra*, 20 Cal.3d at p. 292.) As for other cases, they involved a permit or statute that authorized the nuisance at issue, which does not exist here. (*Carson Harbor I*, *supra*, 270 F.3d at pp. 870, 887; *Jordan*, at p. 1252 [wastewater discharge permit]; *Avedon*, at p. 1345 [alleged nuisance was failure to prevent access to cave where fire started; law provided state with authority to operate park and decision to allow cave access fell within it].)

     ii.  *The trial court erred in applying prior owner consent*

The issue here is whether prior owner consent barred Defendants' liability. A prior owner's consent can preclude tort liability for its lessee. In *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125 (*Mangini*), the Court of Appeal addressed tort claims by an owner against lessees of former owner and held that "where . . . an owner . . . seeks damages for creation of a nuisance by a prior lessee, the lessee has a defense that his use of the property was lawful and was authorized by the lease, i.e., his use of the property

was undertaken with the *consent* of the owner." (*Id.* at p. 1138; *id.* at p. 1141 [consent can apply for trespass, but exceeding consent could support liability].)

However, consent does not necessarily limit liability for the prior owner itself. (*Mangini*, *supra*, 230 Cal.App.3d at p. 1134 [rejecting contention that "a successor owner of property could not sue a prior owner for nuisance"]; *Chevron U.S.A. Inc. v. Superior Court* (1994) 44 Cal.App.4th 1009, 1014 ["Recent decisions have confirmed . . . a subsequent owner's right to sue a prior possessor of property for creating the continuing nuisance," citing *Mangini*, inter alia].) In *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334 (*Newhall*), the Court of Appeal determined an owner was not precluded from stating a nuisance claim against prior owners. (*Id.* at p. 343.) The court rejected extension of *Mangini*'s lessee holding, explaining "it does not make sense to . . . find an owner can never be liable to a successor in interest for nuisance because the owner consented to his own use of the property." (*Newhall*, at p. 345; *id.* at p. 347 [applying same reasoning to trespass]; see *KFC Western, Inc. v. Meghrig* (1994) 23 Cal.App.4th 1167, 1178-1179 [accord].) *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160 (*Beck*) did extend *Mangini* to shield a former owner based on its own consent, but noted the owner conducted its activities lawfully and an intermediate purchaser had "full knowledge of the past usage of the property." (*Beck*, at p. 1216.)

Here, the trial court determined "the discharge of lead pellets and target debris did not lack the consent of either the owner or operators of the shooting range before 1982" and this consent barred the nuisance and trespass claims, citing *Mangini* and *Beck*. The

51

court found, among other things, that Baldwin "knowingly accepted the [P]roperty with the shooting range" and allowed Enniss to operate it.

Plaintiffs contend prior owner consent is not a defense, and courts have not embraced *Beck*. We conclude the trial court erred here, and need not decide today whether to follow or reject *Beck*. The weight of authority makes clear owners generally can sue prior owners, notwithstanding their presumptive consent. (See, e.g., *Newhall*, *supra*, 19 Cal.App.4th at p. 343.) Even assuming *Beck*, *supra*, 44 Cal.App.4th at p. 1216, were sound, for its holding to apply, Defendants' conduct must have been pursuant to their consent and lawful, and Baldwin, as an intermediate owner, must have had "full knowledge" of the nuisance activity. (*Ibid.*; see *Rev 973 LLC v. Mouren-Laurens* (C.D. Cal., Apr. 22, 2009, No. CV 98 10690 AHM (Ex)) 2009 U.S. Dist. Lexis 38462, at pp. *24-*30 [rejecting reliance on *Beck*, where defendants did not address whether use was lawful and there was dispute over whether purchaser had " 'full knowledge' of the former owner's activities"].) The trial court failed to meaningfully address these issues. For example, Baldwin permitted Enniss to operate the range, but only pursuant to a lease that required reclamation of lead and target debris — evidencing, if anything, a lack of consent to leaving those materials. The court did not address lawfulness (other than to suggest in the Civ. Code, § 3482 context that the permits sufficed; they did not). As for knowledge, the court's findings appear to undermine any conclusion that Baldwin had "full knowledge." The court found James Baldwin (a member of the Baldwin entities) was aware of the range when he bought it, but felt it would remain open space and " 'didn't pay much attention to it.' "

52

On remand, the court should reevaluate the persuasive value of *Beck* in light of the other authorities, and if it still concludes *Beck* applies, apply its holding consistent with the foregoing analysis.

### iii. *The trial court erred in finding consent by Plaintiffs*

This issue concerns whether an as-is provision in Plaintiffs' purchase agreement for the Property (Purchase Agreement) and/or their actual knowledge established consent to nuisance and trespass.

Here, the Purchase Agreement indicated the Property was being acquired " 'as-is' " from the Estate. The as-is provision included, among other things, "the condition or suitability of the earth." In addition, the schedule of exceptions from the Estate's representations and warranties included debris remaining from the range. A contractual as-is provision can relieve a seller of liability. (See *Shapiro v. Hu* (1986) 188 Cal.App.3d 324, 333 (*Shapiro*) ["use of the phrase 'as is' relieves a seller of real property from liability for defects in that condition"]; *ibid.* [as-is term "serves as a kind of 'red flag' warning"].) In *Galen v. Mobil Oil Corp.* (C.D. Cal. 1996) 922 F.Supp. 318 (*Galen*), the district court granted summary judgment on nuisance and trespass claims involving an allegedly concealed sump, after concluding they were barred by an " 'as-is' " provision in the sales contract. (*Id.* at p. 324.) In a separate discussion on a rescission claim, the court noted certain "pre-purchase 'red flags.' " (*Id.* at pp. 320-321.)

The trial court determined that "[w]here a buyer such as [Plaintiffs] purchases a shooting range with substantial knowledge of its environmental condition, any nuisance or trespass claim against the prior owners is barred as an assumed and accepted risk."

53

The court cited *Galen*, suggesting it held that nuisance and trespass claims were barred both by pre-purchase red flags *and* an as-is provision. The court explained the evidence established Plaintiffs had "actual knowledge that lead and target debris existed at the shooting range," and that "[s]uch knowledge is implied consent to acceptance of the environmental conditions."

Plaintiffs contend the as-is provision is irrelevant, because they are not suing the Estate, and their knowledge would only be relevant in that context. We agree the as-is provision with the Estate is irrelevant. *Galen*, *supra*, 922 F.Supp. 318, involved an as-is term between a buyer and seller (*id.* at p. 319), and is silent as to its effect, if any, on the liability of third parties. Defendants are third parties here, and *Galen* is inapplicable. As for Plaintiffs' knowledge, we need not address its relevance to an as-is analysis, because there is no as-is provision with Defendants. We note, however, that *Galen*'s nuisance and trespass analysis does not reflect that plaintiff knowledge bars recovery, and the only red flag reference in that analysis is a citation to *Shapiro*'s description of an as-is provision as a red flag. (*Galen*, at p. 324.) Finally, we are aware of no authority that knowledge by a purchaser of real property amounts to assumption of risk or implied consent for purposes of nuisance and trespass. Even if such authority existed, the evidence does not reflect Plaintiffs had actual knowledge of the alleged tortious conduct.[31]

_____

31    The court found Plaintiffs had "actual knowledge of the lead and target debris, either directly or by imputation," citing the Purchase Agreement, an environmental report prepared before purchase, and testimony by OLC president Paul Borden reflecting he was aware some kind of remediation probably was needed. But the conduct at issue is

54

We conclude the court erred in each of its determinations as to Plaintiffs' tort claims, and need not address whether it also erred by declining to proceed to a jury phase.

3.  *The trial court erred in identifying when Plaintiffs' claim accrued*

The trial court found Plaintiffs' HSAA claim accrued when they purchased the Property. Plaintiffs contend this was erroneous, and we agree.

The HSAA does not contain a statute of limitations for contribution or indemnity actions under section 25363(e). "Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements" . . . .' This is the 'last element' accrual rule[.]' . . . [¶] . . . [T]he courts and the Legislature have over time developed a handful of equitable exceptions to and modifications of the usual rules governing limitations periods. . . . The ' "most important" ' of these doctrines, the discovery rule, where applicable, 'postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.' " (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191-1192, citations omitted (*Aryeh*).)[32] When a statute is silent as to when a claim accrues, this silence "triggers a presumption in favor of permitting settled common law accrual rules to apply." (*Aryeh*, at p. 1193.)

---

Defendants' failure to reclaim lead and target debris. At most, this evidence reflects Plaintiffs' awareness that some lead and debris remained.

[32]    One of these doctrines is "continuous accrual." (*Aryeh*, *supra*, 55 Cal.4th at p. 1199.) We decline to address Plaintiffs' argument, raised for the first time on reply, that this rule applies to cost actions under the HSAA. (*Shade Foods*, *supra*, 78 Cal.App.4th at p. 894, fn. 10.)

55

Here, the court determined the three-year statute of limitations under Code of Civil Procedure section 338, subdivision (b), for "action[s] for trespass upon or injury to real property" applied to Plaintiffs' HSAA claim. Plaintiffs do not challenge this aspect of the court's ruling, and we do not address it. The court then found the statutory period "commenced when [Plaintiffs] knew or should have known of the facts giving rise to the claim, which is no later than October 15, 1998," and cited *Chubb*, *supra*, 710 F.3d at page 972. October 15, 1998, was the date OLC purchased the Property.

Plaintiffs contend their claim did not accrue until they paid remedial action costs. We agree. Because the HSAA is silent as to when a contribution or indemnity action accrues, common law accrual rules apply. (*Aryeh*, *supra*, 55 Cal.4th at p. 1193.) As discussed *ante*, the HSAA permits "[a]ny person who has incurred removal or remedial action costs in accordance with this chapter or the federal act [to] seek contribution or indemnity from any person who is liable pursuant to this chapter . . . ." (§ 25363(e).) Plaintiffs could not establish all elements of their HSAA claim, and that claim could not accrue, at least until they incurred removal or remedial action costs.[33]

---

[33] We do not find *Chubb* instructive. There, an insurer filed a CERCLA action for cleanup costs paid on behalf of an insured, which included "state law claims for statutory indemnity under the California Health and Safety Code, negligence per se, and strict liability." (*Chubb*, *supra*, 710 F.3d at p. 955.) The court concluded Code of Civil Procedure section 338, subdivision (b) applied, the claims accrued when the "injury to the property occur[red]," and this occurred when the insured knew or should have known about the release of hazardous substances. (*Chubb*, at p. 972.) Even assuming section 338, subdivision (b) applied to the HSAA, the injury under the HSAA is not the release of contamination, but rather the incurrence of recoverable costs.

This outcome is consistent with the limitations periods for DTSC-initiated HSAA claims and CERCLA actions, where accrual likewise relates to the response action. (See § 25360.4, subd. (a); Stats. 2006, ch. 77, § 34 ["An action under Section 25360 for the recovery of the costs of removal or remedial action incurred by the [DTSC] . . . shall be commenced within three years after completion of the removal or remedial action has been certified by the [DTSC]."]; 42 U.S.C. § 9613(g)(2)(A), (B) [cost recovery action generally "must be commenced . . . for a removal action, within 3 years after completion" and "for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action"].)[34]

Defendants argue that even assuming accrual was based on incurrence of costs, substantial evidence reflects Plaintiffs began incurring costs sufficiently early that their claim would still be time-barred. Plaintiffs disagree, and suggest the trial court did not actually make any findings in this regard (given it found no costs were recoverable, between the right of action issue and cost reductions). We agree. Although the court concluded various categories of costs were not recoverable (as we discuss *post*), it never addressed when Plaintiffs began to incur response costs. Plaintiffs objected below to the court's failure to resolve issues relating to when it first paid response costs, and we will

---

[34] See also 42 United States Code section 9613(g)(3) ("No action for contribution for any response costs or damages may be commenced more than 3 years" after "judgment . . . for recovery of such costs or damages," applicable administrative order, or "judicially approved settlement with respect to such costs or damages").

not infer the court made those findings.  We remand so the court can determine when the claim accrued.

4. *The trial court erred in finding Defendants were beneficiaries of the Estate's release*

The trial court erred in determining Defendants were affiliates, assigns, and/or successors of the Estate and, thus, third party beneficiaries of the release provision in the Purchase Agreement.  Plaintiffs contend these conclusions were in error.  We agree.

a. *Additional facts*

Several factual matters are relevant to the release issue:  the release provision, the will for the Estate, background on UEL and the Estate's assignment of its UEL interest back to UEL, certain pleadings and discovery requests, and trial testimony.  Starting with the release provision, the Purchase Agreement identified OLC as the Offeror and City National Bank (CNB), an Estate co-executor, as the "Designated Co-Executor."  Section 18 of the Purchase Agreement contains the release, which provides:

> "The Offeror agrees that none of the Designated Co-Executor, the Estate and all of their respective officers, directors, co-fiduciaries, shareholders, employees, representatives, beneficiaries, affiliates, attorneys and agents (including without limitation Douglas Wilson Companies), and their successors and assigns (together, 'Offering Parties') shall be responsible or liable for, and the Offeror hereby waives, any and all claims for damages against the Offering Parties arising from or relating to the Offeror's reliance on any representation, inducement, promise or agreement made by any Offering Party, except for the representations and warranties expressly set forth in this Agreement.  The Offeror further agrees that the Estate Co-Executors hold the Property solely as fiduciary agents, and that neither the Designated Co-Executor nor any other person or entity included within the scope of Offering Parties shall be personally liable in any respect whatsoever for any cause of action which the Offeror may have arising out of or relating to the Property.  The Offeror further agrees that its rights and claims in such case shall be limited exclusively to such, if any, as the Offeror may have against the assets of the Estate itself."

58

The Will and Testament of Mary Marshall Rand Birch Patrick (Patrick Will) provides that Rose Patek is a co-executor of the Estate, along with a bank co-executor (which was CNB by the time of the Purchase Agreement). The beneficiaries do not include Defendants.

UEL was a limited partnership, with John Knox as the general partner. As set forth in its partnership agreement (the UEL Partnership Agreement), the initial limited partners were the Estate, the Stephen and Mary Birch Foundation, Inc. (the Foundation), Rose Patek, and her husband Patrick Patek. By the time Plaintiffs purchased the Property, Rose Patek was not a limited partner. In March 1998, the Estate and UEL entered a transaction, pursuant to which UEL received 920 acres in Proctor Valley and an assignment of the Estate's remaining UEL interest. The Estate executed the assignment of partnership interest in July 1998. It defined the Estate as Assignor and UEL as Assignee, and stated in part:

> "Assignor hereby assigns to Assignee and Assignee hereby acquires from Assignor the Assignor's entire partnership interest in UE, Ltd., including but not limited to, Assignor's capital account as well as the right, title and interest of Assignor in and to the properties (real and personal), capital, cash flow distributions, and profits and losses of UE, Ltd. allocable to Assignor. Assignee hereby agrees to assume (but only to the extent that Assignor may have any personal liability thereon, and only as between the parties hereto and solely for the benefit of Assignor) all liabilities, obligations and responsibilities of Assignor under the UE, Ltd. partnership agreement, as amended."

Turning to the litigation materials, Plaintiffs served interrogatories in the federal case defining UE Defendants' affiliates as including the Estate. In this case, OLC, OLC president Borden, and others filed a cross-complaint, which stated they believed cross-defendants (including Defendants and the Estate) "were agents, representatives, affiliates,

59

members, partners and/or employees of each of the [cross-]defendants." Finally, Plaintiffs' closing trial brief took the position that prior to the assignment, the Estate was a UEL affiliate (by virtue of its limited partner status).

With respect to the trial testimony, the Estate's attorney, Farley, testified about the release. Her testimony reflected the Estate added the release provision to the draft Purchase Agreement and she was "aware of that language or part of the team that drafted or approved" it. Farley stated "affiliates" meant "whoever touched this property," including "any prior owners of the property," and explained the reasons for including it. She testified she told Borden "he was waiving all rights against anybody by virtue of purchasing this," but she did not tell him what she meant by "anybody," or that she intended "affiliate" to include UEL and Baldwin. She indicated he did not ask questions about the release. As for assigns, Farley testified UEL was an assign of the Estate "[b]ecause we sold to [UEL] the 920 acres and we assigned our . . . interest in [UEL] back to it back in March of 1998."

Borden also testified about the release. When asked what affiliate meant, Borden stated "it's an entity that's controlled . . . by or controlling another entity, like a subsidiary company." He testified nobody told him "before [he] signed the document" that the word included Defendants or prior owners. Borden testified he assumed "assigns" meant "somebody that was a legal beneficiary of whatever terms were incorporated in this agreement." Plaintiffs' counsel asked "[o]f the Estate?" and Borden agreed.

Farley and Rose Patek also testified about entities over which Patek had control and her recusal from marketing of the Property. Farley indicated, among other things,

60

that Rose and Patrick Patek were Foundation trustees and controlled the Foundation and the Jewels of Charity (a nonprofit spun off from the Foundation). Patek confirmed she and her husband were officers of the Foundation and stated the Foundation controlled three of seven director seats in the Jewels of Charity (held by her and her family). Farley also indicated that after an initial effort to sell the Property, to which Estate beneficiaries objected, the court authorized CNB to be the sole co-executor to market the Property. Patek explained the court "asked [her] to recuse [her]self . . . on the land side of the deal" and that CNB "would be in charge of . . . remarketing the land at that time."

      b. *Applicable law*

A release agreement is governed under general principles of contract law. (*General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 439.) "The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties." (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 763.) "Although the intent of the parties determines the meaning of the contract . . . , the relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." (*Shaw v. Regents of Univ. of Cal.* (1997) 58 Cal.App.4th 44, 54-55, citation & fn. omitted.)

"A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." (Civ. Code, § 1559.) "The third party need not be identified by name. It is sufficient if the [third party] claimant belongs to a class of persons for whose benefit it was made." (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1485.)

The standard of review here turns on the role of extrinsic evidence. " 'An appellate court is not bound by a construction of the contract based solely on the terms of the written instrument without the aid of evidence . . . , where there is no conflict in the evidence . . . , or a determination has been made upon incompetent evidence . . . .' " (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865, citations omitted; *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 [accord].) This remains the case "[e]ven where uncontroverted evidence allows for conflicting inferences to be drawn . . . ." (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 390.)

        c.     *Analysis*

            i.     *The Estate attorney's testimony as to her intent is incompetent and we apply independent review*

Plaintiffs contend our review is independent, because the court's interpretation rests largely on undisputed facts, and the only conflicting testimony — from Farley — was improper extrinsic evidence. We agree.

Extrinsic evidence may be introduced " 'to explain the meaning of a written contract . . . [if] the meaning urged is one to which the written contract terms are reasonably susceptible,' " but cannot be used to " 'add to, detract from, or vary the terms of' " an integrated agreement. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343, 345.) Here, the court's analysis (described *post*) reflects the relevant release terms are clear and consistent with their accepted meanings, and we agree. The court considered extrinsic evidence in interpreting these provisions. Most evidence was

relevant to the affiliate, assign, or successor issues implicated by the release terms, and was thus admissible — but not in conflict. Farley's testimony reflected different meanings for affiliate and assign than those set forth in the contract — and thus was not competent. (*Casa Herrera*, at p. 345; see *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444 [witness's "opinion as to the meaning and legal effect of a contract" was inadmissible as to interpretation of contract].)[35]

We recognize party intent can be relevant in third party beneficiary cases. (See, e.g., *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516 [considering uncontroverted extrinsic evidence in assessing claim that release had a mutual mistake]; *Cline v. Homuth* (2015) 235 Cal.App.4th 699, 705-706 [noting parties in third party beneficiary cases generally " ' "should be allowed to testify as to their actual intention," ' " while confirming admissible evidence is that " ' "relevant to prove a meaning to which the language is 'reasonably susceptible' " ' "].) But such evidence is not always relevant, including where it contradicts contract terms. (See, e.g., *Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1035 [testimony as to intent did not raise triable issue where "intention was fully and accurately expressed by the language of the release"]; *Cline*, at p. 712 ["evidence of

---

[35] Farley's statement that she told Borden he was "waiving all rights against anybody" does not render her testimony relevant, given it was contrary to the contract, she never told him what she meant by "anybody," and there is no evidence he shared her view. (See *PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 157 ["subjective statements of 'understanding' are irrelevant . . . , particularly where there is no evidence that [the other party] had the same understanding"].)

undisclosed subjective intent of Cline and his attorney is insufficient to establish that the parties intended that Homuth be excluded from the release."].)

Given the clear language of the release, Farley's contradictory trial testimony was not relevant and we are not bound by the trial court's interpretation.

### ii. *Defendants are not affiliates of the Estate*

Plaintiffs contend the court erred in concluding UEL was an affiliate of the Estate based on common control, focusing on the fact that Rose Patek did not control the Estate. The court's interpretation was erroneous, including for this reason.

Common control is a basis for an affiliate relationship. (See, e.g., Corp. Code, § 150 ["A corporation is an 'affiliate' of . . . another specified corporation if it directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the other specified corporation."]; Black's Law Dict., *supra*, at p. 69, col. 2 ["affiliate" is a "corporation that is related to another corporation by shareholdings or other means of control"].) Control typically involves authority to direct the management of an entity. (See, e.g., Corp. Code, § 160, subd. (a) [generally, " 'control' " means "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation."].) Assessing whether someone controls an entity implicates corporate formalities. (See, e.g., *Liberty Prop. Trust v. Republic Prop. Corp.* (D.C. Cir. 2009) 577 F.3d 335, 340-341 ["[A]ppellees argue Kramer and Grigg controlled the trust, which was the general partner of the limited partnership, and so controlled the limited partnership as well. . . . [¶] . . . Even assuming

64

it were proper to disregard the corporate form, [they] did not exercise sufficient control of the limited partnership . . . ."].)[36]

The trial court determined: "California law is clear that common control of entities directly or indirectly through intermediaries makes them 'affiliates' of each other." With respect to the UE Defendants, the court found "[t]he Pateks were . . . in common control of the Estate . . . and [UEL] with the power to direct or cause the direction of each," noting, among other things, Rose's role as coexecutor of the Estate and the Pateks' control of UEL via their control of the charities (including the Foundation, which the court found owned nearly 100 percent of UEL after the assignment). The court also made findings unrelated to control. The court found the evidence "establishe[d] that the intertwining and long-standing relationship between UE, the Pateks, the Patrick family, and later the Patrick Estate" was known to Plaintiffs' parent company, HomeFed, before the sale. The court also found evidentiary admissions by Plaintiffs, citing the federal interrogatories, cross-complaint, and closing trial brief. Finally, the court cited Farley's testimony that the release extended to all prior owners (and described her testimony at length), while noting elsewhere that Borden did not ask her about its scope. We address the court's findings as to the Baldwin Defendants, *post*.

---

[36] See also, e.g., *Seroctin Research & Techs., Inc. v. Unigen Pharms., Inc.* (D. Utah 2008) 541 F.Supp.2d 1238, 1243 (finding unpersuasive argument that "members of the same family of companies" were affiliates, where strongest evidence was they were owned by same person); *In re Blinds to Go Share Purchase Lit.* (1st Cir. 2006) 443 F.3d 1, 7 (rejecting claim that word "indirect" expanded voting control to "include practical control of any kind"; "[i]n context, the word refers only to corporate structure").

The trial court erred in interpreting affiliate to include the UE Defendants. While the court recognized the term affiliate was clear and that affiliate status can be based on common control, it failed to analyze whether the Pateks actually had control over the Estate (or UEL, for that matter). Its other findings were irrelevant.

First, Plaintiffs contend Rose Patek did not control the Estate as a co-executor, because the probate court retains ultimate control. Although we decline to find an executor could never exercise control sufficient to establish common control, we conclude the probate court's authority, including over property sales, limited Patek's control here. A personal representative does have direction over an estate, and can take some actions without authorization. (Prob. Code, § 9600, subd. (a) [personal representative has "management and control of the estate"]; see, e.g., *id*., §§ 9650, subds. (a)-(b) [take possession of property, collect debts, receive profits, and pay taxes], 9760 [continue operation of decedent's business for up to six months].) But the representative generally must file accounts with the court (*id*., §§ 10950-10951), and various powers require court authorization (*id*., § 9610), including real property sales. (See, e.g., *id*., §§ 10300 et seq. [governing real property sales], 10310, subd. (a) [court "shall examine" necessity of sale and benefit to beneficiaries (unless will provides for sale), and representative's efforts to obtain best price], 10313, subd. (a) [court "shall make an order confirming" sale if it appears, among other things, good reason existed and the

66

sale was legal and fairly conducted].)[37]  Courts have long recognized these limitations.

(See, e.g., *Estate of Palm* (1945) 68 Cal.App.2d 204, 212 [affirming removal of

administrator; executor's "possession and handling of the property are subject to the

control of the probate court"]; *Estate of Beach* (1975) 15 Cal.3d 623, 643 (*Estate of

Beach*) ["The executor . . . derives his power to act as such from the will, or order of the

court; but in his conduct of the affairs of the estate, he is subjected largely to the

discretion and control of the court."]; *Shannon v. Superior Court* (1990) 217 Cal.App.3d

986, 993 [executor is "an officer of the court . . . , subject to the continuing control of the

court"].)[38]

We address two issues raised by Defendants.  First, they argue Rose Patek's

recusal reflects common control.  If anything, the recusal reflects a lack of control on her

part.  If a joint representative is unable to act, the court may "authorize the remaining . . .

representative[] to act as to all matters embraced within its order."  (Prob. Code, § 9630,

subd. (c).)  After the court asked Patek to recuse herself, and she did so, the remaining

coexecutor — CNB — had sole authority to market the Property, subject to probate court

---

37      Authority is further limited where there are joint co-executors.  (Prob. Code,
§ 9630, subd. (a)(1) ["Where there are two personal representatives, both must concur to
exercise a power."].)

38      We reject Defendants' contention that the cases are factually distinguishable
(which is not relevant to our analysis), or that courts draw a distinction between control
and supervision (which the cases do not reflect).  (Cf. *Estate of Beach*, *supra*, 15 Cal.3d
at p. 643 [executor mismanagement claim is "based on conduct that is subject to the
independent control and supervision of the . . . court"].)

approval of the sale. Second, Defendants note the trial court cited testimony that Rose Patek was an Estate trustee, and contend a trustee has " 'the power to acquire or dispose of property' " under Probate Code section 16226. Even assuming Patek were an Estate "trustee" (and the Patrick Will does not reflect this), that provision applies to trusts, not decedent estates, and is inapposite. (Prob. Code, § 16226; cf. *County of Los Angeles v. Morrison* (1940) 15 Cal.2d 368, 371 ["[A]lthough a . . . representative of an estate, in a broad sense, does act in the capacity of a trustee . . . , nevertheless he is not a trustee in the general acceptation of the term."].)

Although Plaintiffs do not focus on the UEL control findings, we note the court's analysis is even less convincing in that context. The court focused on the Pateks' alleged control of the charities, including the Foundation, which owned the largest share of UEL after the assignment. Control of a limited partnership generally rests with its general partner, not whatever limited partner owns the largest share — or any limited partner, for that matter. (See Corp. Code, §§ 15904.02-15904.03, 15903.02-15903.03.) The UEL Partnership Agreement is consistent with these principles, and provides management authority solely to the general partner, John Knox, not to the Foundation or any other limited partner.[39] We recognize Plaintiffs represented the Estate had control over UEL

_____

[39] See, e.g., UEL Partnership Agreement sections 8.1 ("Except to the extent otherwise provided herein, the General Partner shall have the sole and exclusive right to manage the business of the Partnership"), and 8.4 ("[n]o Limited Partner shall have any right to take part in the management of the Partnership or to transact any business on its behalf," subject to the ability to work for and/or advise the general partner and to vote on certain matters).

68

as a limited partner prior to the assignment, but absent facts supporting this treatment, that characterization lacks merit.[40]

The court's remaining findings also do not establish the UE Defendants were affiliates of the Estate. These findings focus on Plaintiffs' purported awareness of the Pateks' role, their characterization of the entities in discovery and pleadings, and Farley's input. As we concluded *ante*, the meaning of affiliate is clear, and implicates the issue of control. Plaintiffs' awareness and litigation papers do not relate to that issue, and Farley's testimony is irrelevant for other reasons.

Finally, we turn to the Baldwin Defendants. The court found they were affiliates based entirely on Farley's testimony; this was erroneous, for the reasons discussed *ante*. Further, the Baldwin Defendants neither allege, nor establish, common control with the Estate.

### iii. *Defendants are not assigns of the Estate*

Plaintiffs contend the court erroneously relied on the assignment of partnership interest to conclude UEL was as an assign of the Estate.

Under California law, to " 'assign' ordinarily means to transfer title or ownership of property." (*McCown v. Spencer* (1970) 8 Cal.App.3d 216, 225.) Dictionary definitions are consistent with this usage. (See, e.g., Black's Law Dict., *supra*, at p. 142,

---

[40] The court's assessment of the Foundation and Jewels of Charity is also dubious. Farley's testimony that the Pateks controlled the Foundation is questionable, given she also testified she did not "know the structure of the [F]oundation." It also is not evident the Pateks controlled the Jewels of Charity, as they had only three of seven director seats, and the relationship of Jewels of Charity to UEL remains unclear.

col. 2 [defining "assignee," in relevant part, as "[o]ne to whom property rights or powers are transferred by another"].)  The trial court found the UE Defendants qualified as assigns of the Estate based on the assignment of partnership interest, citing its definition of the Estate as Assignor and UEL as Assignee.  The court explained the "only qualification of 'assigns' . . . is that one must be an assign of the Estate," and the UE Defendants satisfied that definition.  The court also cited Farley's testimony.

This interpretation was erroneous.  The release provision limits liability in connection with the Property (and released party representations, which are not at issue).  A reasonable construction of the term "assign" in this release encompasses assigns with respect to the Property and, arguably, future assigns of the Estate as seller.  The assignment of partnership interest provides no basis for a broader interpretation.  The Property was not part of the assignment (or the transaction that included the assignment), and UEL gained no rights with respect to the Property.  Absent express language in the release encompassing all prior assigns, we conclude a buyer of real property would not intend to release any prior assign of the seller, at any point in time and regarding any matter.  Farley's testimony remains irrelevant.[41]

---

[41]    We reject Defendants' contention that "[a] release in favor of an 'assignee' is effective as to all assignees existing as of the time the release is executed[,]" for which they cite *Manzella v. Paul Revere Life Ins. Co*. (E.D. Pa., Apr. 19, 1994, No. 93-5455) 1994 U.S. Dist. Lexis 4912, at pp. *3-*7. *Manzella*, unlike here, involved an assignment that related to the subject of the later litigation and a release covering any claims whatsoever.  (*Id*. at pp. *1-*2.)

70

iv.     *Defendants are not successors of the Estate*

Finally, Plaintiffs argue the court erred in determining UEL was a successor, based on its reasoning that UEL " 'came after' " the Estate and " 'took its place.' "

A "successor," in general, is " '[o]ne that succeeds or follows; one who takes the place that another has left, and sustains the *like part or character . . . .*' " (*Perez v. 222 Sutter St. Partners* (1990) 222 Cal.App.3d 938, 948, fn. 8; Black's Law Dict., *supra*, p. 1660, col. 2 ["Someone who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor."].)  "Successor in interest" is defined similarly to successor.  (Black's Law Dict., *supra*, p. 1660, col. 2 ["Someone who follows another in ownership or control of property."].)

The trial court found the UE Defendants qualified as successors of the Estate, because that term has been "consistently interpreted to mean a party that comes after and takes the place of another," citing Code of Civil Procedure section 377.11 and California Uniform Commercial Code section 5102, subdivision (a)(15).  The court explained:  "The remaining limited partners of UE . . . 'took the place' of [the Estate] by assuming [its] outstanding partnership interest pursuant to the July 1998 assignment and as such, all UE [Defendants] were already successors of the Estate at the time [OLC] executed the release."

The trial court's interpretation was erroneous.  The only reasonable construction of "successor" in the release, as applied to the Estate, is an Estate beneficiary — a status the UE Defendants do not hold.  Successor could, of course, have broader application for other released parties.  (E.g., CNB.)  Code of Civil Procedure section 377.11 is consistent

71

with this interpretation (*ibid.* [provisions for deceased parties; " 'decedent's successor in interest' " is the "beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action"]), and the California Uniform Commercial Code section is inapposite.[42] The court erred by focusing on the assignment of partnership interest, as the only interest at issue there was the UEL partnership interest. As in the assign context, absent express language encompassing all prior successors, we cannot envision a buyer of real property would intend to release prior successors of the seller, as to unrelated interests.

E.    *The trial court's equitable allocation was an abuse of discretion*

Plaintiffs contend the court abused its discretion in making its allocation and, specifically, by allocating all costs to them. We agree the court abused its discretion, but decline to find any particular allocation is beyond judicial discretion.

1.    *Applicable law*

At the relevant time, section 25363(e) provided in part that "[i]n resolving claims for contribution or indemnity, the court may allocate costs among liable parties using

---

[42]    That section provides that a " '[s]uccessor of a beneficiary' " means "a person who succeeds to substantially all of the rights of a beneficiary by operation of law." (Cal. U. Com. Code, § 5102, subd. (a)(15).) The issue is not whether UEL was a "successor to a beneficiary," but whether it was a beneficiary of the release *as* a successor. We further note that while the Probate Code does not appear to define the successor of an estate, the provisions for small estates without administration are consistent with Code of Civil Procedure section 377.11 and our interpretation. (Prob. Code, § 13006 [if decedent left will, " '[s]uccessor of the decedent' " is "the sole beneficiary or all of the beneficiaries who succeeded to a particular item of property of the decedent under the decedent's will"].)

72

those equitable factors which are appropriate."  The current version similarly refers to "using appropriate equitable factors."  (§ 25363, subd. (d); Stats. 2015, ch. 458, § 2.)

For contribution actions under CERCLA section 113, courts apply a similar, but not identical, equitable allocation:  "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  (42 U.S.C. § 9613(f)(1); *Boeing Co. v. Cascade Corp.* (2000) 207 F.3d 1177, 1187 (*Boeing*) ["CERCLA provides that 'the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.'  This language gives district courts discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors." (Fn. omitted.)]; *Boeing*, at p. 1187 [CERCLA allocation can be reversed only for "abuse of the discretion to select factors" or "for clear error in the allocation"].)

One set of factors applied by courts in CERCLA allocations, known as the " 'Gore factors,' " includes:

> "(i) the ability of the parties to demonstrate that their contribution to a discharge[,] release or disposal of a hazardous waste can be distinguished;  [¶]  (ii) the amount of the hazardous waste involved;  [¶]  (iii) the degree of toxicity of the hazardous waste involved;  [¶]  (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;  [¶]  (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and  [¶]  (vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment."

(*In re Bell Petroleum Servs.* (5th Cir. 1993) 3 F.3d 889, 899-900 (*Bell Petroleum*).)

"[M]any courts look to the 'Gore Factors'[.]"  (*United States v. Colorado & Eastern R.R. Co.* (10th Cir. 1995) 50 F.3d 1530, 1536, fn. 5.)

Courts have considered other factors as well. (See, e.g., *Environmental Transp. Systems, Inc. v. ENSCO, Inc.* (7th Cir. 1992) 969 F.2d 503, 509 [noting, in addition to Gore factors, factors including "financial resources of the parties," "benefits received by the parties from contaminating activities," and "knowledge and/or acquiescence of the parties in the contaminating activities"]; *United States v. R.W. Meyer, Inc.* (6th Cir. 1991) 932 F.2d 568, 572-573 [district court's use of Gore factors was appropriate, but not necessary; court could consider "state of mind," "economic status," "contracts between them bearing on the subject," and "traditional equitable defenses"].) In *United States v. Davis* (D. R.I. 1998) 31 F.Supp.2d 45, the court concluded the critical factors were: "1. The extent to which cleanup costs are attributable to wastes for which a party is responsible. 2. The party's level of culpability. 3. The degree to which the party benefited from disposal of the waste. 4. The party's ability to pay its share of the cost." (*Id.* at p. 63.)

We review the court's equitable allocation for abuse of discretion. (*Scottsdale Ins. Co. v. Century Surety Co.* (2010) 182 Cal.App.4th 1023, 1033 [equitable apportionment of insurer defense costs; "We review a trial court's choice of a method of allocation for an abuse of discretion."]; *Litgo N.J., Inc. v. Comm'r N.J. Dept. of Envtl. Prot.* (3rd Cir. 2013) 725 F.3d 369, 385-388 [applying abuse of discretion to CERCLA allocation].) "The abuse of discretion standard . . . measures whether . . . the act of the lower tribunal falls within the permissible range of options set by the legal criteria." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831.) "[I]n the case of a statutory grant of discretion," judicial discretion must be measured "against the specific

law that grants the discretion." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393 (*Horsford*).)

2. *Analysis*

The trial court determined there was "insufficient equitable basis to apportion any response costs onto any Defendant," citing section 25363(e) and 42 United States Code section 9613(f)(1) (CERCLA Section 113).

We begin by addressing a threshold issue. In a footnote in their opening brief, Plaintiffs suggested the HSAA "provides for equitable allocation of costs only 'among the defendants,' " citing section 25363, subdivision (b).[43] Defendants offered arguments why section 25363, subdivision (b) is inapplicable here, including its interaction with other subdivisions. Plaintiffs did not respond. Whether, and how, section 25363's subdivisions interact raises important questions. But they are not ones we reach today. The trial court made its allocation under section 25363(e), which encompasses all liable parties (including Plaintiffs, as they concede) and Plaintiffs do not contend that was error. To the extent they suggest failure to consider section 25363, subdivision (b) in making the allocation was erroneous, their cursory discussion does not suffice. (*Stanley*, *supra*, 10 Cal.4th at p. 793.)

---

[43]  Section 25363, subdivision (b) provides: "[I]f the trier of fact finds the evidence insufficient to establish each party's portion of costs or expenditures under subdivision (a), the court shall apportion those costs or expenditures, to the extent practicable, according to equitable principles, among the defendants."

75

We now turn to the trial court's allocation under section 25363(e).  The court focused on the following factors:  (i) Plaintiffs' knowledge and acceptance of potential environmental liabilities; (ii) Plaintiffs' benefits from the remediation; (iii) Plaintiffs' unclean hands; and (iv) Defendants' lawful operation of the range and lack of bad acts. Because our analysis focuses on a factor the court failed to address — party responsibility for contributing to the contamination — we do not address the court's findings in detail. It suffices to note the court found Defendants "operated the shooting range . . . in a lawful manner as far as applicable local agencies were concerned at the time, and in accordance with prevailing standards of care at the time," and Plaintiffs presented no evidence they were " 'bad actors' with respect to the historical operation of the shooting range," citing an absence of accidental spills, waste mishandling, and intentional dumping.  The court found the "individual UE [Defendants] faultless" (referencing Knox and Patek) and concluded "it would be inequitable to shift [Plaintiffs'] costs to any individual UE [Defendant] since none of them contributed to the contamination."   This was the only finding regarding Defendants' contribution to the contamination.

We conclude the trial court's equitable allocation was an abuse of discretion. Under the HSAA, the court may allocate costs using "equitable factors which are appropriate," but may not, as in CERCLA, "us[e] such equitable factors *as the court determines are appropriate*."  (Compare § 25363(e) with 42 U.S.C. § 9613(f)(1), italics added; see *Boeing*, *supra*, 207 F.3d at p. 1187 [confirming discretion under CERCLA to decide on factors].)  Discretion under the HSAA is limited to application of appropriate

equitable factors, and the trial court failed to exercise its discretion consistent with this principle. (*Horsford*, *supra*, 132 Cal.App.4th at p. 393.)[44]

We need not assess whether the factors considered by the trial court were appropriate, because the court failed to consider party responsibility for contributing to the contamination here (other than to find Plaintiffs had unclean hands and with respect to the individual defendants, who are not at issue). Although CERCLA's discretion standard differs, the cases are instructive as to which factors might be appropriate under the HSAA. Party responsibility is a consistent theme, including as part of the widely used Gore factors. (See, e.g., *Bell Petroleum*, *supra*, 3 F.3d at pp. 899-900.) This focus is consistent with the goals of these statutes. (See *Burlington Northern*, *supra*, 556 U.S. at p. 602 [one purpose of CERCLA was to ensure cleanup costs "were borne by those responsible for the contamination"].) Whatever factors are appropriate in making an equitable allocation under the HSAA, party responsibility for contributing to the contamination must be part of the analysis. The court's consideration of the corporate Defendants' purportedly lawful operation of the shooting range, and lack of bad acts, does

---

[44]    We recognize Plaintiffs described the HSAA and CERCLA allocation provisions as "substantively identical," but the issue here is whether the court abused its discretion in applying the HSAA provision, both parties have briefed it, and we are not bound by Plaintiffs' interpretation. Further, the focus of Plaintiffs' position (the court erred by failing to focus on responsible parties) is consistent with our analysis, *post*.

not suffice. However, to the extent Plaintiffs suggest it would never be within a court's discretion to allocate all costs to plaintiffs, we see no such limitation in the HSAA.[45]

F.     *Plaintiffs do not establish the court erred in making cost reductions*

The court denied or reduced Plaintiffs' remedial action costs for internal management time, attorney fees, white material removal, soil removal, and investigative costs.[46] Plaintiffs do not establish these rulings were in error.

1.     *Additional facts*

During the Assembly Bill No. 2061 process, DEH found Plaintiffs' remedial action plan (RAP) met the "requirements of section 25356.1." Section 25356.1 of the HSAA requires, among other things, that plans be based on the National Oil and Hazardous Substances Pollution Contingency Plan (NCP). (§ 25356.1, subd. (d); see also § 25356.1.5, subd. (a)(1) [requiring NCP compliance for HSAA response actions generally].) At the outset of trial, the court ruled issue preclusion should apply to issues "which were necessarily decided by DEH in approving the RAP" (except for sufficiency of documentation, for NCP purposes) and that the court "ha[d] no jurisdiction to consider

---

[45]     Our conclusions here are limited in scope and not an endorsement of the court's application of the factors it did use. Without limitation, we have serious doubts about the court's benefits analysis (which failed to consider benefits to Defendants in electing not to remediate, and misconstrued the concept of double recovery), and its focus on unclean hands (which appeared to be based on Plaintiffs' lead mining that expanded the remediation area and conduct after a water main break, not any increase to the waste).

[46]     There were other cost rulings, but we either already addressed them (right to proceed under the HSAA), concluded Plaintiffs did not establish liability (the wood pile) or Plaintiffs do not challenge them (prejudgment interest; future costs).

or determine" various related matters (Preclusion Order). These included the "appropriateness of the remedial action alternative selected and approved." The Preclusion Order also preserved issues for trial, including whether the costs sought by Plaintiffs "constitute[d] 'remedial action' costs as defined by the HSAA.

   2.    *Applicable law*

Section 25363(e), at the relevant time, allowed for recovery of "removal or remedial action costs." The HSAA defines remedial actions as "actions that are consistent with a permanent remedy . . . in the event of a release or threatened release . . . , as further defined by [CERCLA]"; "actions that are necessary to monitor, assess, and evaluate a release or a threatened release"; and "[s]ite operation and maintenance." (§ 25322, subds. (a)-(c).)

At the same time, the HSAA permits recovery of costs only from "person[s] . . . liable pursuant to this chapter," and the HSAA defines " 'liable person[s]' " as "those persons described in [CERCLA] section 107(a)." (§§ 25363, 25323.5, subd. (a)(1).) CERCLA section 107(a) imposes liability on classes of liable persons for "necessary costs . . . consistent with the [NCP]." (42 U.S.C. § 9607(a)(4)(B); *Carson Harbor I*, *supra*, 270 F.3d at pp. 870-871.) As noted *ante*, the HSAA also requires NCP compliance. (§ 25356.1.5, subd. (a)(1).) With respect to necessity, courts focus, in part, "on whether there is a threat to human health or the environment." (*Carson Harbor I*, at p. 872.) A response action is NCP compliant if the action is, among other things, "in substantial compliance with the applicable requirements." (40 C.F.R. § 300.700(c)(3)(i).)

79

These requirements include "documentation . . . sufficient to provide . . . [an] accurate accounting of . . . costs."  (40 C.F.R. § 300.160(a)(1).)

    3.    *Analysis*

Plaintiffs challenge both the court's general approach and specific cost rulings. Starting with the court's approach, the court denied many costs for being unnecessary (noting, for example, that some were duplicative), and also concluded certain costs were unrecoverable based on NCP noncompliance.  Plaintiffs contend the court should have evaluated whether their costs were incurred for remedial actions, that necessity is not required under the HSAA, and that the court's findings were contrary to the Preclusion Order and in excess of its jurisdiction.

First, an HSAA plaintiff must establish not only that the costs were incurred for removal or remedial actions, but also that they were necessary and NCP compliant.  Any failure to focus on whether the costs were for remedial actions would not be dispositive, because Plaintiffs must also demonstrate necessity and establish no error in that regard.

Second, necessity *is* required.  Plaintiffs suggest the only CERCLA liability provisions that apply under the HSAA are those identifying the classes of liable persons (e.g., prior owners).  But the HSAA defines liable persons as "those persons described in section 107(a) of the federal act," without limiting CERCLA section 107(a)'s application to the liable person classes.  (§ 25323.5, subd. (a)(1).)  Plaintiffs also note CERCLA definitions are not used in the HSAA when the context requires otherwise.  (§ 25310.) Necessity is an element of the claim, not a definition, and regardless, Plaintiffs do not explain why the HSAA would permit recovery of potentially unnecessary costs, where

80

CERCLA would not. In turn, the considerations noted by the court can be relevant to a necessity analysis. (See, e.g., *U.S. v. Iron Mountain Mines*, *Inc.* (E.D. Cal. 1997) 987 F.Supp. 1263, 1272 (*Iron Mountain*) [duplicative investigative costs generally not necessary].)

Third, Plaintiffs' arguments as to the Preclusion Order lack merit. The order was based on DEH's determination that Plaintiffs' RAP complied with section 25356.1 — which reflects NCP compliance, not necessity under CERCLA liability standards. Thus, the court's necessity findings did not conflict with the order. As for the court's decision to address NCP compliance, Plaintiffs do not establish error. They rely primarily on the court's determination in the Preclusion Order that it lacked jurisdiction to consider the appropriateness of the remedial action approved by the DEH. But the court evidently changed its mind, and while that change in course is concerning, Plaintiffs provide no authority that doing so was improper. Plaintiffs forfeit any error in this regard. (*Stanley*, *supra*, 10 Cal.4th at p. 793.)

Plaintiffs also suggest, more generally, that DEH approval actually did deprive the court of jurisdiction to address whether their costs were recoverable, effectively entitling them to all claimed costs. Again, they offer no authority for their position. Instead, they cite DEH's "sole jurisdiction over all activities . . . necessary to respond to the . . . release" in the Assembly Bill No. 2061 process (§ 25264, subd. (a)), and Defendants' ability to challenge the DEH-approved plan at the time. The Assembly Bill No. 2061 process is distinct from HSAA cost recovery, as discussed *ante*. We do assume, without deciding, that DEH approval pursuant to the Assembly Bill No. 2061 process can serve as

81

evidence that a cleanup was necessary and NCP compliant, to the extent the process implicated those issues. But Plaintiffs did not challenge the cost rulings on substantial evidence grounds (except as to sufficiency of their records, which we do not reach, and certain arguments raised on reply, which we will not address.)[47]

We now turn to the specific costs. First, Plaintiffs sought internal management time for remediation work performed by employees of their parent company, HomeFed. The trial court denied these costs, because, among other reasons, Plaintiffs had not paid for work by HomeFed employees, and because the work was not documented in compliance with the NCP. Plaintiffs contend the court disregarded two cost sharing agreements between FRLC and HomeFed, and that substantial evidence did not support the court's documentation ruling. The agreements do not establish Plaintiffs incurred costs for HomeFed employee time. Indeed, they do not address remediation of the Property at all, much less reflect that Plaintiffs actually paid for HomeFed employee work on the remediation.[48] We do not reach Plaintiffs' contention that their records were sufficient.

_____

[47]    Necessity is reviewed for substantial evidence, and NCP compliance is viewed as a mixed question of law and fact. (*Orange County Water District v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 327, 331.) Plaintiffs also contend the court abused its discretion in excluding a document related to the final RAP, but do not establish they were prejudiced by this exclusion. (*Soule*, *supra*, 18 Cal.4th at pp. 573-574.)

[48]    The agreements do not refer to specific property. The only references to property or environmental matters are in the preamble: "[OLC] . . . has or will transfer title to certain real property to FRLC and FRLC will undertake the process of entitling the real

Second, Plaintiffs sought costs for what they call remedial attorney fees; i.e., nonlitigation remediation work by counsel. Neither the HSAA, nor CERCLA's cost recovery or contribution provisions, provide for attorney fees. (§ 25300 et seq.; 42 U.S.C. §§ 9607, 9613.) However, in *Key Tronic Corp. v. United States* (1994) 511 U.S. 809 (*Key Tronic*) the United States Supreme Court held that while "CERCLA § 107 does not provide for . . . private litigants' attorney's fees," some "lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of [CERCLA] § 107(a)(4)(B)." (*Id.* at pp. 819, 820.) The court determined "work performed in identifying other PRP's [potentially responsible parties] falls in this category," and the plaintiff could claim such efforts "significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." (*Id.* at p. 820.) The court contrasted this with work on an EPA consent decree, which it viewed as "primarily protecting Key Tronic's interests as a defendant in the proceedings that established the extent of its liability" and thus unrecoverable. (*Id.* at pp. 820, 821.)

Here, the trial court denied costs for remedial attorney fees because the HSAA lacks an attorney fee provision, the fees were not necessary, and the documentation was insufficient. For necessity, the court found the work was "primarily incurred to secure a direct benefit to [Plaintiffs] — a certificate of completion," citing *Key Tronic* and its EPA

property, processing lot line adjustments, enforcing legal claims and rights under the environmental laws, and selling or transferring some or all of the real property."

holding. The court had noted statements from Plaintiffs' closing trial brief in its discussion of the Assembly Bill No. 2061 process, reflecting counsel was retained, at least in part, to guide that process and secure the certificate of completion.

Plaintiffs contend the fees are recoverable under the HSAA, the court applied the wrong standard in finding them unrecoverable, and the time was sufficiently documented. We agree remedial attorney fees are recoverable under the HSAA as a response cost, consistent with CERCLA. (*Key Tronic*, *supra*, 511 U.S. at p. 817; see *BNSF Ry. Co. v. California* (E.D. Cal., Jan. 7, 2009, No. 2:08-CV-JAM-JFM) 2009 U.S. Dist. Lexis 2802, at p. *9 [interpreting "HSAA 'response costs' consistent with CERCLA response costs"].) But we find unpersuasive Plaintiffs' argument that the court erroneously focused on whether fees were expended " 'primarily incurred to secure a direct benefit,' " rather than whether the work was " 'closely tied to' " or " 'significantly benefited' " the cleanup (i.e., the *Key Tronic* holdings related to finding "PRP's"). The court was relying on the holding that fees in connection with an EPA consent decree were not recoverable, which Plaintiffs make no effort to distinguish. Regardless, they cannot prevail because they do not demonstrate prejudice. They cite *Calabrese v. McHugh* (D. Conn. 2001) 170 F.Supp.2d 243 to contend recoverable fees include " 'designing a removal action, drafting contracts with environmental professionals . . . , and monitoring the work progress.' " (*Id.* at p. 268.) But they do not explain how their counsel's work was consistent with *Key Tronic* or *Calabrese*. To the contrary, they represent counsel was "hired by [Plaintiffs] to liaison with the local and state regulatory agencies to shepherd the project through the

AB 2061 process," which aligns with the trial court's findings and supports its application of *Key Tronic*. We do not reach whether the records for these costs were sufficient.

Third, the court found white material costs were not recoverable because the removal was unnecessary (as the material was not a risk to health or the environment) and because Plaintiffs "inadequately assessed the substance and failed to consider alternatives to removal in violation of the NCP." The court did not address the Preclusion Order. Plaintiffs argue, among other things, that "disallowing costs relating to . . . the 'white material' because the removal was not necessary or called for under the NCP . . . was directly contrary to [the court's] own prior order." As noted *ante*, Plaintiffs do not establish it was error for the court to later elect to address these issues. Regardless, they cannot establish reversible error, as they do not contest the necessity findings on substantial evidence grounds.[49]

Fourth, Plaintiffs sought $2,554,287 for soil removal. The court concluded they could not recover $761,944, because they "unnecessarily over-remediated the site." The court noted the RAP called for removal of 65,000 cubic yards, and Plaintiffs removed over 90,000. Plaintiffs contend the court disregarded an RAP statement that the " 'actual volume' " of soil would depend on other factors, and that the remediation was performed in accordance with the RAP — meaning the costs were NCP compliant. But the court's

---

[49] Plaintiffs do argue the white material necessity findings were "contrary to the determination of DEH." Even assuming the DEH approval were evidence of necessity, this does not establish there was no substantial evidence for the court's finding that removal was unnecessary.

findings were based on necessity, not the NCP. Further, even if the " 'actual volume' " reference in the RAP provided evidence of necessity for *some* volume of soil removal beyond 65,000 cubic yards, plaintiffs would still need to prove necessity for the amount ultimately removed.

Finally, Plaintiffs sought $2,781,413 in investigation costs. The court determined they could not recover $2,312,746 of these costs, because they were "duplicative of other costs, not cost-effective, not fiscally reasonable or necessarily incurred." Plaintiffs contend that neither duration nor repetition "sheds light on whether a particular action is a 'remedial action' consistent with the NCP." But, as noted *ante*, they may be relevant to necessity. (See, e.g., *Iron Mountain*, *supra*, 987 F.Supp at p. 1272; see also § 25322, subd. (b) [HSAA remedial actions include those "*necessary* to monitor, assess, and evaluate" releases (italics added)].)

G.      *Defendants' appeals as to attorney fees and costs are moot*

Defendants contend the trial court erred in denying them fees and costs as prevailing parties. Because we reverse the judgment, Defendants are no longer prevailing parties and their appeals are moot. (*Venturi & Co. LLC v. Pacific Malibu Development Corp.* (2009) 172 Cal.App.4th 1417, 1424.)

IV.

DISPOSITION

The judgment is affirmed as to the trial court's rulings on disking, the wood pile, and cost reductions (except with respect to costs denied in connection with the absence of a DTSC action and Plaintiffs' use of the Assembly Bill No. 2061 process). In all other respects, the judgment is reversed and remanded for further proceedings consistent with this opinion. The trial court shall receive such additional evidence as it deems necessary and appropriate, and, in the event jury proceedings are warranted, shall hold such proceedings. Defendants' appeals regarding attorney fees and costs are moot. Plaintiffs shall recover their costs on appeal.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DATO, J.

87